**INDIANA INSURANCE GUARANTY ASSOCIATION, Appellant–Defendant,**

v.

**Janelle BLICKENSDERFER, D.O., and Alan H. Bierlein, M.D., Appellees–Plaintiffs.**

No. 20A05–0110–CV–448.

Court of Appeals of Indiana.

Nov. 13, 2002.

Andrew W. Hull, Angela D. Hiott, Hoover Hull Baker & Heath, LLP, Indianapolis, IN, Attorneys for Appellant.

Edward A. Chapleau, South Bend, IN, Attorney for Appellee, Janelle Blickensderfer, D.O.

Dane L. Tubergen, Mark W. Baeverstad, Hunt Suedhoff Kalamaros, LLP, Fort Wayne, IN, Attorneys for Appellee, Alan H. Bierlein, M.D.

## OPINION

BARNES, Judge.

### Case Summary

The Indiana Insurance Guaranty Association ("IIGA") appeals the judgment entered in favor of Drs. Janelle Blickensderfer and Alan Bierlein (collectively "doctors"). This case involves a question of first impression regarding the application of the Indiana Insurance Guaranty Law of 1971 ("the Act"), found at Indiana Code Section 27–6–8–1 *et seq*. We affirm.

### Issues

We restate the issues presented by IIGA as follows:

I. whether the trial court erroneously held that proceeds from health insurance policies do not reduce IIGA's obligation to pay under Indiana Code Section 27–6–8–11(a);[1] and

II. whether the trial court erred in its determination that IIGA owes a continuing duty to defend the doctors under Indiana Code Section 27–6–8–7(a)(ii) of the Act.

### Facts

IIGA is a statutorily-created entity that operates under the Act to "provide a mechanism for the payment of claims under certain insurance policies" when certain insurers become insolvent. Ind.Code § 27–6–8–2. Blickensderfer and Bierlein are physicians practicing in Indiana. Each purchased malpractice insurance with limits of $100,000 per occurrence from P–I–E Mutual Insurance Company, which subsequently became insolvent. Each physician was sued for malpractice in unrelated cases, and they sought indemnification and defense from IIGA because of the insolvency of their malpractice carrier. The health insurance provider for each of the claimants paid over $100,000 for expenses resulting from the injuries alleged to have been caused by the malpractice. IIGA refused to defend or indemnify the doctors from the claims asserted against them on the basis of the non-duplication of recovery provisions of Indiana Code Section 27–6–8–11.

The doctors each sought declaratory judgment against IIGA to establish its coverage duties and liabilities, which suits were consolidated. In June 2000, the doctors filed a motion for summary judgment, to which IIGA responded and filed a cross-motion for summary judgment. The trial court denied the motions and tried the matter on July 5, 2001. The trial court entered judgment against IIGA and held that the health insurance benefits paid to the claimants did not reduce the indemnification obligations of IIGA and that IIGA was required to defend the doctors in the medical malpractice claims. The trial court determined in relevant part:

---

1. IIGA also appeals the trial court's denial of its motion for summary judgment. This case presents a question of law rather than fact; thus, because we determine that the trial court correctly resolved the set-off question, it follows that the IIGA is not entitled to summary judgment in its favor.

10. [IIGA] reviewed the ... claims and concluded that, because the health insurance providers ... paid [the claimants] more than $100,000.00 in health insurance benefits, the non-duplication of recovery provision ... exhausted the liability insurance limits of [IIGA]. In reliance upon this non-duplication of recovery provision, [IIGA] refused to provide a defense or indemnify [the doctors]. ...

13. ... State courts which have interpreted insurance guaranty law have held that non-duplication of recovery provisions, such as the one found at Indiana Code § 27–6–8–11, do not apply to health insurance benefits. ... The non-duplication of recovery provision does not apply to health insurance benefits paid to a claimant because health insurance benefits are forms of insurance expressly excepted by the Model Guarantee [sic] Act. [*Alabama Insurance Guaranty Assoc.*, 514 So.2d 1000, 1002 (Ala.1987).] Similarly, Indiana Code § 27–6–8–3 provides that "This chapter applies to all kinds of direct insurance except life, annuity, health, or disability insurance."

14. ... In a situation like the one presented in this case, where a claimant receives health insurance benefits, which are expressly excepted, and files a medical malpractice claim against an insured health care provider, the claimant will not receive a windfall judgment or obtain double recovery. The purpose of guaranty law is best fulfilled by excluding health care benefits from the non-duplication of recovery provision of the statute. To ignore this exclusion would defeat the entire purpose of guaranty

law in that insured health care providers would get no relief and would suffer extreme financial loss in the event their insurers became insolvent.

Appendix pp. 17–18. IIGA now appeals.

### Analysis

At the outset, we note that we apply a de novo standard of review to this case because it involves a pure question of statutory interpretation; the facts are not in dispute. "A question of statutory interpretation is a matter of law to be determined by this court. We are not bound by a trial court's legal interpretation of a statute and need not give it deference. We independently determine the statute's meaning and apply it to the facts before us." *Perry–Worth Concerned Citizens v. Board of Comm'rs of Boone Co.*, 723 N.E.2d 457, 459 (Ind.Ct.App.2000) (citations omitted), *trans. denied.*

### I. Health Insurance Payments

■ Indiana adopted the Act, with modifications, from the Model Insurance Guaranty Act ("Model Act"). The Model Act has been adopted in one form or another in every state. The purpose of the Act is:

> to provide a mechanism for the payment of claims under certain insurance policies to avoid excessive delay in payment and to avoid excessive financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of this protection among insurers.

I.C. § 27–6–8–2.[2] The Act attempts to achieve its stated purpose of avoiding ex-

---

**2.** The Indiana General Assembly altered the language of the Model Act by including the term "excessive" to modify the kind of "financial loss" the Act seeks to avoid. IIGA makes much of the fact that Indiana is the only state

legislature to have done so. IIGA cites *Indiana Ins. Guar. Ass'n v. William Tell Woodcrafters, Inc.*, 525 N.E.2d 1281 (Ind.Ct. App.1988), for the following language:

cessive financial loss to claimants and/or policyholders by creating an "association" of "member insurers." *See* I.C. §§ 27–6–8–4(2), 27–6–8–4(6) & 27–6–8–5.

The essence of IIGA's argument is that because the health insurance companies of the claimants allegedly injured by the malpractice of the doctors had already paid more than $100,000 each for medical expenses, IIGA was not responsible for any further coverage under the Act. Resolution of this case turns on the interpretation of Indiana Code Section 27–6–8–11, which provides:

(a) Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first the person's right under the policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of recovery under the insurance policy.

The express language of the statute and the rules of statutory construction apply. *See ISTA v. Board of School Comm'rs of Indianapolis*, 693 N.E.2d 972, 974 (Ind.Ct. App.1998). Where the language of the statute is clear and unambiguous, there is nothing to construe. However, where the language is susceptible to more than one reasonable construction, the statute must be construed to give effect to the legislature's intent. *Civil Rights Comm'n v. County Line Park, Inc.*, 738 N.E.2d 1044, 1048 (Ind.2000). The statute is examined as a whole, and courts should avoid excessive reliance on a strict literal meaning or the selective reading of individual words. *Id.* The legislature is presumed to have intended the language used in the statute to be applied logically and not to bring about an unjust or absurd result. *Id.* Further, we are "compelled to ascertain and execute legislative intent in such a manner as to prevent absurdity and difficulty and prefer public convenience. In so doing, we are required to keep in mind the objects and purposes of the law as well as the effect and repercussions of such a construction." *Koppin v. Strode*, 761 N.E.2d 455, 461 (Ind.Ct.App.2002) (quoting *Spears v. Brennan*, 745 N.E.2d 862, 869–70 (Ind. Ct.App.2001) (citation omitted)).

IIGA argues that the operative words of the statute are: " 'Any person having a *claim* against an *insurer* under any provision in an *insurance policy* ... shall be required to exhaust first the person's right under the policy.' " Appellant's Br. p. 13 (quoting Indiana Code Section 27–6–8–11(a)) (original emphasis). IIGA then argues that the benefits paid by the claimant's health insurance carriers are just such claims as identified by the first sen-

Nor does our decision frustrate the policy underlying the guaranty law. The legislature created the Association and the fund it administers in order to protect the public from losses arising from the insolvency of insurers doing business within the state. The Association is intended to provide a cushion for insureds and claimants when the insolvent insurer is unable to pay claims pursuant to the policies it has issued. The Association does not completely step into the shoes of the insolvent insurer, however.

&ast; &ast; &ast; &ast; &ast; &ast;

The dollar limitation set forth in [Indiana Code Section] 27–6–8–7(a)(i) limiting the Association's obligation ... make[s] clear that the legislature did not intend to place all risk of loss upon the Association. The risk of loss for amounts exceeding these figures has been assigned to the insureds. *Id.* at 1285–86. We do find the inclusion of the word "excessive" to be determinative to our analysis today.

tence of Section 27–6–8–11(a) and that under the second sentence of the section, any amounts that it may owe to the claimants should be reduced by the amount paid as health care benefits by the claimants' health insurance carriers. Because the claimants' health insurance carriers have paid in excess of $100,000 on each claim and because the maximum amount that IIGA would owe on each claim is $100,000, IIGA contends that it has no further obligation to the claimants or to the doctors.

The doctors respond by asserting that IIGA's interpretation of Section 27–6–8–11(a) would lead to an absurd result. Under IIGA's interpretation, the claimants must exhaust *any* claim they would have under *any* policy. The doctors posit that in a scenario where a claimant had a separate insurance claim pending for an unrelated loss such as automobile property damage, IIGA's interpretation would require the claimant to exhaust that claim and credit IIGA those unrelated insurance proceeds against any amounts payable by IIGA to the claimants. The doctors claim IIGA has pointed to no language of the statute that would permit a different outcome based on IIGA's interpretation.

IIGA maintains that under the so-called last antecedent rule, the phrase "which is also a covered claim" modifies "other than a policy of an insolvent insurer." Reply Br. p. 10. The doctors assert that IIGA's interpretation "defies the laws of statutory interpretation and common grammar." Appellant's Br. p. 6. They argue that the phrase "which is also a covered claim" modifies, "Any person having a claim against an insurer under any provision in an insurance policy." Appellees' Br. p. 9. "It cannot possibly modify the phrase, 'Other than an policy of an insolvent insurer', because that phrase refers to an insur-

ance policy and the modifier phrase refers to a claim." *Id.* "Put another way," they assert, "the proceeds of an insurance policy which must be exhausted by a claimant holding a 'covered claim' against an insolvent insurer are the proceeds of a policy which collaterally insures the 'covered claim'." Appellees' Br. p. 11 (citing *De-Vane v. Kennedy,* 205 W.Va. 519, 519 S.E.2d 622, 623 (1999)). The doctors cite numerous cases supporting this interpretation, including *Sands v. Pennsylvania Ins. Guar. Ass'n,* 283 Pa.Super. 217, 423 A.2d 1224 (1980); *Bullock v. Pariser,* 311 Pa.Super. 487, 457 A.2d 1287 (1983); [3] *DeVane v. Kennedy,* 205 W.Va. 519, 519 S.E.2d 622 (1999); *Rhode Island Insurers' Insolvency Fund v. Benoit,* 723 A.2d 303 (R.I.1999); *Zhou v. Jennifer Mall Rest., Inc.,* 699 A.2d 348 (D.C.1997); *Washington Ins. Guar. Ass'n v. McKinstry Co.,* 56 Wash.App. 545, 784 P.2d 190 (1990); *Alabama Ins. Guar. Ass'n v. Stephenson,* 514 So.2d 1000 (Ala. 1987); *Harris v. Lee,* 387 So.2d 1145 (La. 1980); *McMichael v. Robertson,* 77 Md. App. 208, 549 A.2d 1157 (1988).

The Indiana legislature surely did not intend that the statute would require a claimant to exhaust a claimant's rights under any conceivable insurance policy for any conceivable claim that may then be pending, even if such a claim or such a policy had nothing to do with the claim against the insolvent insurer. Such an interpretation would indeed produce an absurd result. The only provision in the statute that limits the requirement to exhaust other insurance coverage to insurance coverage relating somehow to the covered claim is the phrase "which is also a covered claim." IIGA's interpretation of the statute would effectively render that phrase meaningless. We cannot ignore the phrase given its presence in the stat-

---

**3.** Since *Sands* and *Bullock,* Pennsylvania has revised its statute to expressly include health

insurance and other policies as ones that must be exhausted by a claimant.

ute. The phrase clearly modifies the clause, "Any person having a claim against an insurer under any provision in an insurance policy." It cannot modify the clause "Other than a policy of an insolvent insurer" because that phrase refers to an insurance policy and the modifier phrase refers to a claim. The statute refers to "any person having a claim against the insurer under any provision in an insurance policy . . . which is also a covered claim," making an exception "other than a policy of an insolvent insurer." The string of cases cited above reached the same interpretation of the language, and IIGA points us to no case that interprets the statute as it proposes.

When the requirement to exhaust claims against other insurance policies is limited to claims that are also "covered claims," the claims for direct health insurance benefits in this case cannot fall within the requirements of the statute because those claims are not "covered claims" under the definition provided by Section 27–6–8–4(4), which defines a "covered claim" as:

> As used in this chapter, unless otherwise provided:
>
> \*  \*  \*  \*  \*  \*
>
> (4) The term "covered claim" means an *unpaid claim which arises out of and is within the coverage* and not in excess of the applicable limits *of an insurance policy to which this chapter applies issued by an insurer, if the insurer becomes an insolvent insurer* after the effective date (January 1, 1972) of this chapter and (a) the claimant or insured is a resident of this

state at the time of the insured event of (b) the property from which the claim arises is permanently located in this state.

(emphasis supplied). In this case, the claimants' "covered claim" arose out of alleged negligence that was within the coverage of the P–I–E policies. The covered claims against the doctors depend on tort liability, namely medical malpractice. The claimants' claims for health insurance benefits do not depend upon the tort liability of the doctors. The health insurance benefits are a matter of contract between the claimants and their health insurance carriers. The claimants' benefits received through their health insurance policies did not arise out of and were not within the coverage of an insurance policy of an insolvent insurer (P–I–E). The P–I–E policies insured against the risk of medical malpractice, or at the least claims of medical malpractice; the health insurance carriers did not specifically insure against that risk.

Furthermore, the definition provides that a covered claim is an "unpaid claim which arises out of and is within the coverage and not in excess of the applicable limits *of an insurance policy to which this chapter applies.*" I.C. § 27–6–8–4(4) (emphasis supplied). The scope of the Act as set forth in Section 27–6–8–3 is that "[t]his chapter applies to all kinds of direct insurance except: (1) life, annuity, health, or disability insurance;  . . . ." Thus, the plain language of this section makes it clear that the chapter does not apply to health insurance and, as a result, a "covered claim" could not stem from health insurance benefits.[4]

---

**4.** IIGA also argues that the General Assembly intended that in Section 27–6–8–11(a) "insurer" and "insurance policy" should have "broad, common-sense meanings" and that although a health insurer is excluded from being a "member insurer" pursuant to Section 27–6–8–3, the "distinction between

'member insurer' and 'insurer' in fact supports the Association's position that Section 11(a) of the Act by its express terms must apply to all insurers." Appellant's Brief p. 15. IIGA urges the court, as it did at the trial level, to apply a broad meaning to "insurer"—"any insurance company even if the Act

A typical example of the application of Indiana Code Section 27–6–8–11(a) is in the context of uninsured motorist coverage. If claimant A is injured in an automobile accident with tortfeasor B who is insured by an insolvent insurer, claimant A has a "covered claim" against IIGA. If claimant A also carried uninsured motorist coverage under his own automobile policy, claimant A would be required by Section 27–6–8–11(a) to first exhaust all of his right under his uninsured motorists policy. The amounts that claimant A collected under his uninsured motorist policy would then be set off against the limits of liability applicable to IIGA. Claimant A's claim against his uninsured motorists policy is a "covered claim" because it is unpaid and arises out of and is within the coverage of the insurance policy issued by the insolvent insurer.

This reading of the Act is consistent with the way several other jurisdictions have interpreted substantially similar statutes, although IIGA challenges the trial court's reliance on the following cases: *McCarthy v. Bainbridge*, 739 A.2d 200 (Pa.Super.Ct.1999), *appeal granted by* 563 Pa. 647, 758 A.2d 1200 (2000), *and aff'd by* 565 Pa. 464, 774 A.2d 1246 (Pa. June 20, 2001); *Clark Equip. Co. v. Arizona Prop. and Cas. Ins. Guar. Fund*, 189 Ariz. 433, 943 P.2d 793 (Ct.App.1997); *Alabama Ins. Guar. Ass'n v. Stephenson*, 514 So.2d 1000 (Ala.1987); and *McMichael v. Robertson*, 77 Md.App. 208, 549 A.2d 1157 (Md.1988).

*McCarthy* presented a question of first impression for the Superior Court of Pennsylvania regarding the proper interpretation to be given to Pennsylvania's version of the non-duplication of recovery section of that state's version of the Insurance

Guaranty Act. Codified at 40 P.S. Section 991.1817, Pennsylvania's non-duplication section provides:

(a) Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy. For purposes of this section, a claim under an insurance policy shall include a claim under any kind of insurance, whether it is a first-party or third-party claim, and shall include, without limitation, accident and health insurance, worker's compensation, Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer. Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance.

*McCarthy*, 739 A.2d at 201–02. Clearly, this non-duplication provision is markedly different from Indiana's. At first glance, in fact, it would seem to mandate the broad interpretation sought by IIGA in the instant case, given its inclusion of "any kind of insurance," and its inclusion of "accident and health insurance . . . and all other coverages. . . ." However, the Pennsylvania Superior Court reasoned as follows:

Appellants [the Pennsylvania Property and Casualty Insurance Guaranty Association (PIGA)] assert that the non-duplication of recovery provision is clear on its face and requires the setoff of every conceivable claim any claimant against PIGA has under any kind of insurance. They ask us to focus exclusively on one phrase in the section, i.e., "any kind of insurance." Such an interpretation leads to an unjust, unreasonable and absurd result. Broadly applied, appel-

doesn't apply to [it]," in order to bring health insurance payments into the ambit of the setoff provision found at Indiana Code Section 27–6–8–11. Tr. p. 46. Despite IIGA's insis-

tence that health insurance be brought under the auspices of the Act, the plain language of the Act says on its face that it does not apply to health insurance.

lants' interpretation would mean that there need be *no* connection between the claim asserted against [the insolvent insurer], and the other claim that must be offset under § 991.1817. Hypothetically, then, if appellees in this case had a totally unrelated claim for a loss of property under an ocean marine policy, they would be required under § 991.1817 to offset that claim against their claim against PIGA resulting from the alleged medical malpractice of the insolvent insurer's insured doctors. Since this is a clearly absurd result, and yet is a necessary corollary of appellants' argument, we must reject appellants' overly simplistic construction of this statutory provision.

Rather, we conclude that there must be some relationship between the claim against PIGA and the claim under other insurance that must be offset. The only reasonable reading of the offset provision is to require that the claim to be offset must be for the same loss as the claim asserted against PIC. In other words, the claim must be under insurance that sought to protect the insured against the same risk as was covered by the now insolvent insurer for whom PIGA is providing coverage.

*Id.* at 202–03. The court reasoned:

[t]he medical malpractice insurance provided by the now insolvent insurer was casualty insurance, which is generally defined as: That type of insurance that is primarily concerned with losses caused by injuries to persons and legal liability imposed upon the insured for such injury or for damage to the property of others.

*Id.* (citing Black's Law Dictionary, 721 (5th ed. 1979)). By contrast, the court noted, the risk contemplated by life insurance is "the death of a particular person." *Id.* (citing Black's 723.) The two types of

insurance are, therefore, "fundamentally different, most notably because they insure against different risks and protect against different types of loss … [I]t is not duplicative to recover twice when each recovery is for a different loss." *Id.*

In *Clark Equip. Co. v. Arizona Prop. & Cas. Ins. Guar. Fund,* 189 Ariz. 433, 943 P.2d 793 (Ct.App.1997), the Court of Appeals of Arizona addressed whether the state's property and casualty insurance guaranty fund ("the Fund") was entitled to an offset of damages for worker's compensation benefits paid to a plaintiff injured by a forklift manufactured by Clark Equipment, whose excess liability insurer had been liquidated. Section 20–673(A), Arizona's non-duplication of recovery provision, provides as follows:

Any person having a claim against an insurer under any provision in an insurance policy which is also a covered claim shall be required to exhaust first all rights under such policy. Any amount payable on a covered claim pursuant to this article shall be reduced by the amount of such recovery under the claimant's insurance policy.

*Id.* at 802, n. 11. Like Indiana's version of the Act, Arizona's contained a section providing that the article creating the Fund "all apply to all kinds of insurance *except* " certain listed types, including worker's compensation. *Id.* at 803 (citing A.R.S. § 20–680). The *Clark* court disagreed with the Fund's argument that this section only exempted such insurance "from the administration of insolvencies, and not from the offset provisions" of the Act. *Id.* The court noted:

[T]he insurers who provide the types of insurance excluded by A.R.S. section 20–680 are excluded from providing assessments to the Fund as "member insurers." A.R.S. §§ 20–661(6), –666(A). The Fund pays its "costs, expenses and

liabilities" from the assessments of the member insurers. *See* A.R.S. §§ 20–662, –666(A). If workers' compensation proceeds were allowed as an offset to Fund obligations, then, effectively, non-member, exempt insurers would be financing those obligations.

Accordingly, we hold that A.R.S. section 20–673 requires an offset to Fund liability only when the other applicable insurance has not been excluded by A.R.S. section 20–680. Workers' compensation payments may not provide an offset. *Id.* In Indiana, although workers' compensation insurance is not excepted as it is in Arizona, the relevant type of insurance, health, is excepted pursuant to Indiana Code Section 27–6–8–3(1).

In *Stephenson,* 514 So.2d at 1000, Stephenson, injured in an automobile accident, was enrolled in a self-funded employee health benefit plan administrated by Blue Cross–Blue Shield of Alabama. The defendant had a liability insurance policy with a company that was at the time of the litigation in receivership and under limited operation by The Alabama Insurance Guaranty Association. Blue Cross paid over $5000 in medical benefits on Stephenson's behalf, and, as here, the Association sought to deduct those benefits from its obligation under the Act. Alabama's non-duplication of recovery provision provided as follows:

> Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his rights under the policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under such insurance policy.

Ala.Code of 1975, § 27–42–12. The court held that the Blue Cross health insurance is "a kind of direct insurance excepted by the provisions of § 27–42–3" and therefore did not fall under the non-duplication provision. *Stephenson,* 514 So.2d at 1002. In reaching this conclusion, the court cited *Harris v. Lee,* 387 So.2d 1145 (La.1980) and *Bullock,* 311 Pa.Super. at 487, 457 A.2d at 1287, and agreed with the *Bullock* court's reasoning that the result was "consonant with the purpose of the Act" as well as with the purpose of the non-duplication of recovery provision, i.e., to avoid "double recovery" or a windfall.

In *McMichael,* 549 A.2d at 1157, after an automobile accident, the plaintiffs were awarded a judgment of $275,000 against McMichael and Charter Line Bus Company, whose casualty insurance provider had been declared insolvent. The Maryland Property and Casualty Insurance Guaranty Corporation ("PCIGC") did provide a defense and pay part of the judgment; however, the plaintiffs sued the PCIGC when it did not pay the entire judgment. The PCIGC then claimed entitlement to a setoff "for any amount received by the plaintiffs from any source that paid the plaintiffs for any loss related to their injuries ...," including uninsured motorist insurance, personal injury protection ("PIP"), Blue Cross–Blue Shield, and union sick leave benefits. *Id.* at 1158.

The *McMichael* court examined the purpose of the Maryland version of the Act: "to provide a mechanism for the prompt payment of covered claims under certain insurance policies and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer...." *Id.* at 1160. It determined that uninsured motorist ("UM") benefits were properly deducted as a setoff because UM coverage is considered a "covered claim" within the meaning of the Act. "When defendant's insurance company became insolvent, PCIGC stepped into its shoes and was

obligated to continue UM protection, consequently UM coverage is a covered claim of the insured because it was an obligation of the insolvent insurance company." *Id.* The court determined that PIP benefits, too, fell within the category of "covered claims." However, the court determined that the plaintiffs' health insurance and union payments were not covered claims within the meaning of the Act because "a covered claim means the obligation of an insolvent insurer." *Id.* at 1161. The *McMichael* court, as had the Alabama Supreme Court in *Stephenson,* cited *Bullock,* 311 Pa.Super. at 487, 457 A.2d at 1287. In reaching its conclusion that health and union benefits were not to be setoff as against liability insurance payments, the court noted:

> [Blue Cross/Blue Shield] benefits were paid by the health care insurer for medical bills, hospitalization, etc., regardless of the fault of the tortfeasor or whether a judgment was entered against the tortfeasor. Likewise, the Union benefits were paid regardless of any liability of a judgment against the tortfeasor.... Thus, neither payment arose out of the obligation of the insolvent insurer. Therefore, [Robertson's] recovery ... cannot be considered a 'covered claim' and will not be set off....

*Id.* at 218–19, 549 A.2d 1157.

The result we reach today is also consistent with the holding in a recent case by another panel of this court in *Indiana Insurance Guaranty Association v. Kenneth D. Davis, M.D.,* 768 N.E.2d 902 (Ind. Ct.App.2002), *trans. pending.* In that case, Kimberly Murray sued Kenneth Davis, M.D., for medical malpractice. During part of the time Dr. Davis treated Murray, he carried medical malpractice insurance through P–I–E, which subsequently became insolvent. IIGA assumed Dr. Davis's defense, but later advised him that it only had an obligation to pay approximately $6000 in the event he was found to have committed malpractice. IIGA maintained that because it was only obligated for amounts up to $100,000 by statute and Blue Cross–Blue Shield had already paid over $93,000 of Murray's medical expenses, it was only liable for the difference. Dr. Davis filed a third-party complaint for declaratory judgment against IIGA.

The trial court entered judgment in favor of Dr. Davis, finding that IIGA was obligated to pay $93,052.11 in the event that a judgment was entered in favor of Murray. *Id.* at 903. The trial court's rationale was that Murray's medical expenses, lost wages, and miscellaneous out-of-pocket expenses totaled $186,710.59, and that amount constituted the "amount payable" for purposes of Indiana Code Section 27–6–8–11. *Id.* at 903–04. The trial court then reduced that amount by the amount of medical bills paid by Blue Cross. *Id.* at 904.

On appeal, IIGA argued that the trial court incorrectly defined "amount payable" but correctly reduced the amount by the total of the paid medical expenses. Dr. Davis and Murray argued that the trial court correctly defined "amount payable" but that any deduction for the payments made by Blue Cross–Blue Shield should be taken from that total amount of damages. After analyzing the paid medical expenses in relation to the Act, the panel held that the claimant's recovery from Blue Cross–Blue Shield was not a "covered claim" because the Act does not apply to health insurance. *Id.* at 908. The panel also held that IIGA's liability was not to be reduced by the amount of payments Blue Cross–Blue Shield made on Murray's behalf. *Id.* at 909.

In sum, these cases offer ample support for the trial court's interpretation of the set off provision. More importantly, the

language of the statute is clear. We agree that IIGA was not entitled to a set off and, therefore, hold that the judgment entered in favor of the doctors was not erroneous.

## II. Duty to Defend the Doctors

 The trial court held that IIGA must reimburse the doctors for the defense fees and costs that they have incurred or will incur in defending against the malpractice claims. The basis for this ruling is Indiana Code Section 27–6–8–7(a)(ii), which provides that IIGA shall:

> Be deemed the insurer to the extent of its obligation on the covered claims as limited by this chapter and to this extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent, including those relating to reinsurance contracts and treaties entered into by the insolvent insurer. However, the association's obligation to defend any insured of the insolvent insurer or to indemnify against the costs of such defense terminates as soon as the claimant or claimants have been paid all benefits that they are entitled to under this chapter.

IIGA's entire argument on this point is, "Because each claimant received insurance payments that reduced the financial loss by more than the maximum payment by the Association ($100,000) the claimants' covered claims are extinguished. As a result, the Association's obligation to defend [the doctors] is terminated." Appellant's Br. p. 23. The doctors argue, "In taking that position, the Association also impliedly agrees that if the claimants' health insurance benefits are not a setoff against the Association's obligation, then the Association is indeed obligated to defend the doctors and to indemnify them against their costs of defense as required by statute." Appellees' Br. p. 15.

Because we conclude above that the claimants have not been paid all the benefits they are entitled to receive under the Act, the trial court's ruling is correct and IIGA is obligated to defend and indemnify the doctors for their defense costs and liability to the limits set forth in the statute.

## Conclusion

The set off provision contained in the Act does not apply to health insurance benefits, so IIGA was not entitled to credit for those proceeds. As a result, judgment was properly entered in favor of the doctors, and IIGA is obligated to defend and indemnify the doctors in the malpractice action brought by the claimants. We affirm.

Affirmed.

MATTINGLY–MAY, J., and BROOK, C.J., concur.