No. 102,308

JOHN M. BRENNAN, *Appellee*, v. KANSAS INSURANCE GUARANTY ASSOCIATION, *Appellant*.

(264 P.3d 102)

Opinion filed October 21, 2011.

*David A. Hanson*, of Glenn, Cornish, Hanson & Karns, Chartered, of Topeka, argued the cause and was on the brief for appellant.

*Derek S. Casey*, of Prochaska, Giroux & Howell, of Wichita, argued the cause, and *James R. Howell*, of the same firm, was with him on the briefs for appellee.

The opinion of the court was delivered by

BILES, J.: This appeal arises from a medical malpractice lawsuit. John M. Brennan sued his physician, who had a $200,000 professional liability insurance policy. The insurer was declared insolvent after Brennan filed his claim but before he recovered. The Kansas Insurance Guaranty Association (KIGA) is a statutorily created entity that substitutes some coverage for certain claims against insolvent insurers. KIGA denied liability because Brennan received medical reimbursements from his personal health insurance policy that totaled more than the insolvent insurer's policy limits.

The dispositive issue is whether Brennan's due process rights were violated by a retroactive statutory amendment permitting KIGA to offset Brennan's personal health insurance benefits against its liability on the insolvent insurer's policy. The district court declared the statute's retroactive feature unconstitutional. As

explained below, we agree that Brennan's due process rights were violated and find the statute may not be retroactively applied.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts are undisputed. In 2000, Brennan sued Jeff Thode, M.D., for medical malpractice, seeking $2.5 million in damages for injuries sustained during a 1999 treatment. At that time, Dr. Thode's primary professional liability insurer was PHICO Insurance Company. That policy secured $200,000 in coverage. In addition, Dr. Thode carried $800,000 in secondary liability coverage with the Kansas Healthcare Stabilization Fund. The offset controversy arises because Brennan had his own health care insurance policy, which covered injuries caused by others. That policy paid $500,000 for treatments related to the injuries Brennan claimed from Dr. Thode's negligence.

In 2002, a Pennsylvania court declared PHICO insolvent, placing the company into liquidation. It is uncontested that PHICO's insolvency triggered KIGA's statutory obligation to cover the insurer's obligations to the extent provided by the Kansas Insurance Guaranty Association Act (Guaranty Act), K.S.A. 40-2901 *et seq.* But in 2005, while Brennan's lawsuit against Dr. Thode remained pending, the legislature revised the Guaranty Act to expressly authorize KIGA to offset the association's liability with amounts paid by a claimant's medical insurance. The legislation retroactively applied that offset provision to all claims pending, but not yet paid, effective April 14, 2005. L. 2005, ch. 92, sec. 4 ("The provisions of this section, as amended, shall apply to all claims which have not been paid prior to the effective date of this act.").

In September 2005, a settlement agreement was approved in Brennan's litigation against Dr. Thode, which dismissed Brennan's claim with prejudice in exchange for an undisclosed payment by the Healthcare Stabilization Fund. But the agreement did not resolve the question about KIGA's ability to offset payments made by Brennan's health care policy. The district court retained jurisdiction over the $200,000 policy issued by PHICO. To facilitate a resolution to that dispute, Brennan and KIGA stipulated they

would not raise procedural defenses or require Brennan to establish evidence of liability or damages.

For reasons not clear in the record, KIGA did not formally intervene in Brennan's case until 2007. Both parties then filed cross-motions for summary judgment seeking a declaratory judgment on whether KIGA was obligated as a matter of law to pay Brennan for PHICO's $200,000 policy. There were no issues of material fact.

In summary, the parties disputed whether the amendment changed the law or clarified it. KIGA argued the 2005 amendment did not change the law and KIGA had always been entitled under the preamended Act to offset the $500,000 paid by Brennan's health care policy against KIGA's liability on the insolvent malpractice policy. Brennan, on the other hand, argued KIGA was not entitled to the offset under the preamended statute and was statutorily obligated to pay the $200,000 from the moment PHICO was declared insolvent. Any retroactive application of the 2005 amendment, Brennan contended, violated his due process rights. He also made an equal protection argument, claiming the amended statute treated insured and uninsured claimants differently without a rational basis for the distinction.

The district court agreed with Brennan on both due process and equal protection grounds and declared application of the revised statute unconstitutional. The district court found the 2005 amendment substantively changed the prior law by giving KIGA a right to offset its obligation with Brennan's medical insurance benefits that did not exist under the original Guaranty Act. The court held that retroactive application of the 2005 revision violated due process. It also held there was no rational basis to treat claimants with insurance differently than those without insurance when determining whether KIGA was liable for the insolvent insurer's policy.

The district court entered judgment against KIGA for $200,000. KIGA filed a timely notice of appeal. Jurisdiction is proper under K.S.A. 60-2101(b) (civil statute held unconstitutional).

ANALYSIS

*Standard of Review*

Determining a statute's constitutionality is a question of law subject to unlimited review. But under the separation of powers doctrine, this court presumes statutes are constitutional and resolves all doubts in favor of a statute's validity. Courts must interpret a statute in a way that makes it constitutional if there is any reasonable construction that would maintain the legislature's apparent intent. *State v. Laturner,* 289 Kan. 727, 735, 218 P.3d 23 (2009).

A statute's interpretation also is a question of law subject to unlimited review. The legislature's intent governs if it can be ascertained. The first step is to decide whether the legislature's intent may be determined from the statute's plain language, giving ordinary words their ordinary meaning. If the legislature's intent is not clear from the statutory language, a court moves to the second analytical step by applying the canons of construction or examining legislative history. *Double M Constr. v. Kansas Corporation Comm'n,* 288 Kan. 268, 271-72, 202 P.3d 7 (2009).

In order to reach the merits, we will review the following: (1) the Guaranty Act and the 2005 amendment at the heart of this controversy; (2) whether the 2005 amendment had retroactive application; (3) whether the 2005 amendment affected Brennan's vested rights; and (4) remedy. We do not address the district court's equal protection ruling because our decision on the due process claim renders that exercise moot.

*Overview of the Guaranty Act and 2005 Amendment*

The Guaranty Act, K.S.A. 40-2901 *et seq.,* was adopted in 1970. L. 1970, ch. 185, secs. 1-19. Its stated purpose is

"to provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of such protection among insurers." K.S.A. 40-2901.

This purpose guides any interpretation of the Guaranty Act, and it is to be liberally construed to effect these stated purposes. K.S.A. 40-2901. The Act applies to property and casualty insurance, in-

cluding the professional liability/medical malpractice insurance at issue in this case. K.S.A. 40-2902; K.S.A. 40-1102. It was based on the National Association of Insurance Commissioners' widely adopted Post-Assessment Property & Liability Insurance Guaranty Model Act. See *Hetzel v. Clarkin*, 244 Kan. 698, 701, 772 P.2d 800 (1989). The Guaranty Act establishes KIGA as a nonprofit unincorporated legal entity whose membership statutorily comprises all insurers authorized to write insurance covered by the Guaranty Act. K.S.A. 40-2904. KIGA assesses annual fees against member insurers to pay its obligations. The assessment is based on a percentage of insurer premiums. K.S.A. 40-2906(a)(3). KIGA uses the money it receives to cover claims against insolvent insurance companies.

Two specific statutorily imposed duties arise once an insurer is determined to be insolvent. First, KIGA is deemed the insurer to the extent of its statutory obligation on the covered claims and has all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent. K.S.A. 40-2906(a)(2). Second, KIGA is obligated to pay covered claims existing prior to the insolvency determination and any other claims arising within 30 days after that determination. K.S.A. 40-2906(a)(1). In cases other than workers compensation, KIGA's obligation is limited to the face amount of the insolvent insurer's policy, up to a $300,000 cap. K.S.A. 40-2906(a)(1).

But the Guaranty Act has always limited KIGA's obligations by requiring claimants seeking coverage from KIGA to first exhaust (offset) any rights under certain other available insurance claims. K.S.A. 40-2910. This is sometimes referred to as a "nonduplication of recovery" provision. See *Hetzel*, 244 Kan. at 702. Those exhaustion requirements were amended in 2005. L. 2005, ch. 92, sec. 4. The effect of that amendment, if any, is the subject of this dispute. Therefore, a review of both the original and amended statute is required because the success of Brennan's due process argument hinges on whether the 2005 amendment changed KIGA's obligation to Brennan after PHICO became insolvent. The statute in effect at the time PHICO was declared insolvent stated:

"Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim shall be required to exhaust first his right under such policy. Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under such insurance policy." K.S.A. 40-2910(a).

At that time, the Act defined "covered claim" as

"an unpaid claim, including one for unearned premiums, which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this act applies issued by an insurer, if such insurer becomes an insolvent insurer after the effective date of this act and (1) the claimant or insured is a resident of this state at the time of the insured event; or (2) the property from which the claim arises is permanently located in this state. 'Covered claim' shall not include any amount due any reinsurer, insurer, insurance pool or underwriting association, as subrogation recoveries or otherwise." K.S.A. 40-2903(c).

In 2005, the italicized language below was added to explicitly offset benefits from health insurance policies. L. 2005, ch. 92, sec. 4. It states:

"Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim shall be required to exhaust first his right under such policy. *A claim under an insurance policy shall include a claim under any kind of insurance, whether such claim is a first party or third party claim, and shall include, without limitation, accident and health insurance, workers' compensation, Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer.* Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under such other insurance policy." (Emphasis added.) K.S.A. 2010 Supp. 40-2910(a).

The parties concede that if PHICO's insolvency had occurred after the 2005 amendment became law, the offset in controversy here would not present a due process issue under the plain language of the amended statute. But since those are not our facts, we must next determine whether the legislature could reach back and reduce or eliminate KIGA's liability for pending claims with this statutory amendment.

*Retroactive Application of the 2005 Amendment*

To comply with due process requirements, retroactive legislation cannot abolish a vested right. See *Resolution Trust Corp. v. Fleischer*, 257 Kan. 360, 365, 892 P.2d 497 (1995). To decide

whether the 2005 amendment's retroactive application violates Brennan's due process rights by extinguishing a vested right, we must first determine whether KIGA was entitled to offset its liability with Brennan's health insurance under the original statute. If the law did not change, Brennan's due process claim fails. But if we determine that the amendment changed KIGA's obligations from what it was at the time of PHICO's insolvency, we must then determine whether Brennan's right to payment vested prior to the statutory change.

Brennan argues KIGA could not offset amounts paid or payable under a health insurance policy under the provision in effect at the time PHICO became insolvent. He contends the exhaustion requirement in place at that time was intended to keep the claimant in the same position he or she would have occupied absent the insurance company's insolvency. KIGA argues the statute always entitled it to offset health care policy payments and the 2005 amendments merely clarified this then-existing right, citing this court's decision in *Hetzel* to support that interpretation. KIGA also argues the Guaranty Act's purpose is limited to providing a safety net to protect the insured against insolvencies, so limitations on a claimant's recovery properly prevent duplicate recovery and maintain the Act's continued viability. To resolve these conflicting positions, we examine below the statute's explicit purpose and plain language, how other jurisdictions have viewed the same or similar statutory language, and whether the legislature expressed its original intent when it amended the law in 2005.

### (a) *Statutory Purpose*

We turn first to the statute's explicit language. The original K.S.A. 40-2910 provisions required exhaustion when "[a]ny person [has] a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim." On its face, this language cannot mean what it explicitly says because the exhaustion requirement would apply to any "claim against an insurer" even in unrelated circumstances. For example, if Brennan had pending an automobile liability claim for damage to his car against an unrelated insurer, this statute on

its face would require that KIGA receive an offset for the automobile claim before paying on the insolvent PHICO policy. KIGA concedes in its briefs and during oral argument that this is not permitted. But this example illustrates why the statute lacks the clarity KIGA contends exists. Indeed, courts across the country are in conflict about what the offset provision means.

Our court first noted this conflict among jurisdictions in *Hetzel*, in which we observed that various states adopted identical language from the model act, but differing judicial interpretations existed. 244 Kan. at 702. After describing some of those differences, we relied upon the Kansas statute's legislative history to determine that KIGA could offset payments made under a claimant's uninsured motorist coverage. *Hetzel*, 244 Kan. at 701. In doing so, this court found the statutory language ambiguous. As such, we will continue to employ statutory construction rules and the statute's legislative history to determine the intent of the legislature and resolve Brennan's claim.

The Guaranty Act specifically states it should be construed to effect its stated purposes. Two of those purposes are related to this claim: (1) to provide a means for paying covered claims under certain insurance policies; and (2) to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of an insurer's insolvency. K.S.A. 40-2901. In *Hetzel*, this court adopted the statement of purpose identified in an Illinois decision, *Lucas v. Illinois Ins. Guaranty Fund*, 52 Ill. App. 3d 237, 367 N.E.2d 469 (1977). *Hetzel*, 244 Kan. at 703-04. It held:

" 'The statutory purpose is to place claimants in the same position that they would have been in if the liability insurer had not become insolvent. [Citation omitted.] The Act states that the Fund is intended to protect claimants against financial loss because of the insolvency of insurance companies. The difference between the amount of the insolvent insurer's policy limits and the amount paid to claimant by his own insurer is made up by the Fund. To permit a greater recovery than would have occurred had the insurance company remained solvent would both extend the Act beyond its purpose and offend public policy by giving the Act an interpretation which results in a windfall judgment.' " 244 Kan. at 704 (quoting *Lucas*, 52 Ill. App. 3d at 239).

In *Hetzel*, the plaintiff sued Charles Clarkin, claiming $750,000 in damages from a car accident. Clarkin had a $50,000 automobile

insurance policy, but his insurer was insolvent. For her part, Hetzel had a $5,000 personal injury protection (PIP) policy and a $30,000 uninsured motorist policy. She settled with her uninsured motorist insurer for $25,000. She then claimed this settlement exhausted her uninsured motorist policy because that policy allowed her insurer to deduct the amount paid on the PIP policy. Clarkin moved to dismiss the suit against him, arguing K.S.A. 40-2910 required a claimant to first exhaust any right under other covered claims. And since Hetzel failed to fully exhaust her uninsured motorist benefits, Clarkin argued KIGA had no obligation to pay. This argument assumed Hetzel's uninsured motorist coverage had a $30,000 policy limit and that limit was not reduced by the $5,000 PIP policy. The district court agreed and dismissed Hetzel's claim. This court affirmed, holding that a claimant must exhaust his or her own uninsured motorist coverage and that KIGA may offset its liability by the amount the plaintiff could have recovered, *i.e.*, the policy limits. 244 Kan. at 705-07.

The *Hetzel* result is understandable, given the Guaranty Act's stated statutory purpose when applied to uninsured motorist coverage. In those instances, a claimant should not be entitled to recover from KIGA under the insolvent insurer's policy and then use the fact that the insurer was insolvent to make a claim against claimant's own uninsured motorist coverage. A double recovery would result from the insolvency.

But turning back to Brennan's case, the question is whether *Hetzel's* analysis applies to medical insurance benefits recovered from a claimant's own health care policy. We believe it does not. Looking first to the Guaranty Act's statutory purpose, *Hetzel* is easily distinguishable because uninsured motorist benefits are available to the insured when there is insolvency. In other words, had Clarkin's automobile insurer remained solvent, Hetzel would not have had a claim against her uninsured motorist policy. And allowing her to recover from both KIGA and her uninsured motorist coverage would result in a windfall because of that duplication. But a claimant receiving benefits under a health care policy would not receive a windfall. In fact, offsetting the claimant's medical insurance benefits would reduce the total coverage available.

To use Brennan as an example, had Dr. Thode's insurer not become insolvent, there would have been $1,000,000 in professional liability insurance coverage to satisfy Brennan's claim. But under the statutory interpretation advanced by KIGA, the most Brennan could recover after the insolvency would be $800,000 because of the claimed offset. If permitted, such an offset would shift the burden created by the insurer's insolvency onto Brennan and his health care policy carrier instead of having KIGA bear the loss, which would in turn distribute the claim for the insolvent insurer among all solvent ones. This outcome cannot be reconciled with the statutory purposes expressed in the Guaranty Act. For that reason, we find the statutory purpose supports Brennan's argument that K.S.A. 40-2910 did not allow the offset before the 2005 amendment.

### (b) *Other Jurisdictions*

Most jurisdictions addressing whether their own guaranty fund may offset medical insurance benefits under an identical or substantially similar statute to the preamended version of K.S.A. 40-2910 have found no entitlement to offset medical insurance benefits. See *Pritchett v. Clifton*, 738 F.2d 319, 320-21 (8th Cir. 1984) (guaranty association was not entitled to offset amount injured party recovered under her medical insurance policy.); *Connecticut Ins. Guaranty Assn. v. Zasun*, 52 Conn. App. 212, 230, 725 A.2d 406 (1999) (provision was intended "to apply only to prevent duplicate or windfall recoveries for losses sustained by an insured or a claimant resulting from insurer insolvency"); *Indiana Ins. Guar. Ass'n v. Blickensderfer*, 778 N.E.2d 439, 446 (Ind. App. 2002) ("the claim to be offset must be for the same loss as the claim asserted against [the guaranty association]").

As Brennan notes, Pennsylvania enacted an amendment identical to the changes made by the Kansas Legislature in 2005, and Pennsylvania courts have addressed a medical insurance benefits offset under both the original and amended statutes. In *Sands v. PA. Ins. Guaranty Ass'n*, 283 Pa. Super. 217, 423 A.2d 1224 (1980), *superseded by statute as recognized in Blickensderfer*, 778 N.E.2d at 443 n.3, the *Sands* court held the guaranty association was not

entitled to offset medical insurance benefits. 283 Pa. Super. at 225-26. The issue arose again after the amendment was enacted, and the Pennsylvania Supreme Court then allowed the offset for medical insurance benefits based on statutory language identical to the amendment enacted in Kansas. *Bell v. Slezak*, 571 Pa. 333, 346, 812 A.2d 566 (2002). We note the *Bell* decision came several years before KIGA proposed the 2005 amendment to the legislature.

Some decisions from other jurisdictions addressing this issue rely on expressly stated exclusion provisions not contained in the Kansas Guaranty Act. For example, Alabama has held its guaranty association may not offset medical insurance benefits or workers compensation benefits because its guaranty act excludes disability, accident, and health insurance from its scope of coverage. See *Alabama Ins. Guar. Ass'n v. Stephenson*, 514 So. 2d 1000, 1002-03 (Ala. 1987) (health insurance); *Alabama Ins. Guar. v. Magic City Trucking*, 547 So. 2d 849, 851-53 (Ala. 1989) (workers compensation benefits). But these decisions provide no support for, or against, the issue in Brennan's case.

Finally, we concede there is limited support in other jurisdictions for finding an offset allowable under the preamended statute, but none of those cases are directly analogous. For example, in Illinois that state's guaranty fund was entitled to offset health insurance, but that decision was based on a different exhaustion provision that allowed offsets "if the claim under such other policy arises from the same facts, injury, or loss that gave rise to the covered claim against the Fund." Ill. Comp. Stat. ch. 215 § 5/546; *Roth v. Illinois Insurance Guaranty Fund*, 366 Ill. App. 3d 787, 796-98, 852 N.E.2d 289 (2006). And there are two states holding their guaranty funds were entitled to offset medical insurance benefits recovered from workers compensation insurers under provisions identical to the preamended Kansas statute. See *Orren v. Smackover Nursing Home*, 46 Ark. App. 38, 40, 876 S.W.2d 600 (1994) (state guaranty fund not responsible for paying medical bills already paid by employee's health care insurance despite fact employer's workers compensation insurer was insolvent); *Mosier v. Oklahoma Prop. and Cas. Ins.*, 890 P.2d 878, 880 (Okla. 1995) (no

language within the statute limiting the exhaustion requirement to instances preventing duplicate recovery).

Overall, the majority of authority from other states persuasively supports our holding that the preamended Kansas statute did not allow an offset for health care benefits paid to a claimant. Given that the Kansas Guaranty Act was based on a model law, we find the rulings from our sister states with comparable statutory language reinforcing in our conclusion. The remaining question is whether the legislature changed or clarified its intent as to the original enactment when it amended the statute.

(c) *Expression of Original Intent in 2005*

Determining whether the legislature intended to change or clarify an existing law while amending it is a difficult undertaking without an explicit statement of intent. Furthermore, the district court did not address KIGA's clarification argument. It relied solely on *Hetzel* to find that the original enactment only applied to duplicate recovery from double coverage and that KIGA would have owed Brennan benefits before the 2005 amendment.

Ordinarily, courts presume the legislature intends to make a substantive change when it revises an existing law, but this presumption's strength, weakness, or validity changes according to the circumstances. When an original statute is ambiguous, the legislative purpose may be to clarify the statute's ambiguities, not to change the law. *Trees Oil Co. v. Kansas Corporation Comm'n*, 279 Kan. 209, 229, 105 P.3d 1269 (2005) (citing *State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas*, 275 Kan. 763, 773, 69 P.3d 1087 [2003]). A statutory amendment may provide insight into the original enactment's legislative intent if that enactment was ambiguous. Amendments that construe or clarify a prior statute " 'must be accepted as the legislative declaration of the meaning of the original act.' " *Estate of Soupene v. Lignitz*, 265 Kan. 217, 222, 960 P.2d 205 (1998) (quoting 82 C.J.S., Statutes § 384[a], pp. 899-900). Furthermore, " 'an amendment making a statute directly applicable to a particular case is not a conclusive admission by the legislature that the statute did not originally cover [it].' " 265 Kan. at 222 (quoting 82 C.J.S., Statutes § 384[b][2], pp. 906-07). But if the

amendment contains a radical change to a statute's phraseology, it is generally perceived as a legislative declaration that the original law did not " 'embrace the amended provision.' " 265 Kan. at 222 (quoting 82 C.J.S., Statutes § 384[b][2], pp. 906-07).

The legislative history reflects that KIGA proposed the amendment at issue during the 2005 legislative session, and a KIGA representative advocated for its adoption before the Senate and House insurance committees. Minutes of the House Insurance Committee, February 17, 2005; Minutes of the Senate Financial Institutions and Insurance Committee, March 16, 2005. In written remarks distributed to both committees, KIGA self-described the proposed revisions as reinforcing the Guaranty Act's original intent to make KIGA the payor of last resort and providing clarification that the offset requirements apply to all related claims under other insurance, stating:

"As in most states, current law in Kansas specifies that a claim that may be covered under several policies must first exhaust coverage under policies other than the insolvent insurer and that any covered claim payable by [KIGA] is reduced by any recovery from such other insurance. These provisions help assure that [KIGA] is the payor of last resort and also prevents the potential for a double recovery by the claimant. *Our proposed amendments are intended to reinforce these concepts and clarify that the exhaustion and offset requirements apply to all claims under any kind of insurance, regardless of whether first party or third party claims, and including claims under accident and sickness insurance, health insurance and workers' compensation coverage similar to provisions adopted in some of the other states.*" (Emphasis added.) Minutes of the House Insurance Committee, February 17, 2005, attachment 6, p. 9.

But this statement advocating adoption of the amendment is decidedly self-serving since KIGA was aware of the claims pending against it at the time, including Brennan's claim. And we note the amendment's text does not contain any declaration that the legislature intended to clarify the law. See *In re Care & Treatment of Hunt*, 32 Kan. App. 2d 344, 361, 82 P.3d 861, *rev. denied* 278 Kan. 845 (2004) (courts may rely on a legislative body's declaration but must do so cautiously if the declaration is not included in the amendment's text). Even so, KIGA's contention that the amendment is evidence of the original provision's meaning remains plausible given the law's ambiguous language containing a very broad

exhaustion requirement. The problem with accepting this contention is that it contradicts the Guaranty Act's stated purpose, which includes protecting claimants and policyholders from the burdens caused by an insurer's insolvency. It also flies in the face of the legislative directive that the Guaranty Act be liberally construed to achieve its stated purposes. K.S.A. 40-2901.

Accordingly, we hold the 2005 amendment changed the original statute to broaden the offset provisions and was not intended by the legislature to simply clarify already existing offsets. We turn next to addressing whether Brennan's right to the Guaranty Act's protections vested prior to the amendment's effective date.

*Statutory Amendment Affecting a Vested Right*

Generally, a statute operates prospectively unless there is clear language indicating the legislature intended it to operate retrospectively. *Owen Lumber Co. v. Chartrand*, 276 Kan. 218, 220, 73 P.3d 753 (2003). Here, the legislature stated its intent to make the amendment retroactive in K.S.A. 2010 Supp. 40-2910(c) by applying the amendment to all claims not paid before the effective date of the amendment—just as KIGA had requested. But even when such legislative intent is clear, courts still must consider whether a statutory provision's retrospective application will affect vested rights, thereby violating due process. 276 Kan. at 220-21.

The term "vested rights" describes rights that cannot be abolished by retroactive legislation. *Resolution Trust Corp. v. Fleischer*, 257 Kan. 360, 365, 892 P.2d 497 (1995). It is a conclusory term, and the vested rights analysis is inseparable from the ultimate due process inquiry. See 257 Kan. at 364-65. Kansas courts consider the following three factors when determining whether legislation created a vested right:

"(1) the nature of the rights at stake (*e.g.*, procedural, substantive, remedial), (2) how the rights were affected (*e.g.*, were the rights partially or completely abolished by the legislation; was any substitute remedy provided), and (3) the nature and strength of the public interest furthered by the legislation." 257 Kan. at 369.

As to the first factor, Brennan argues the coverage provided by the Guaranty Act is remedial in nature. KIGA argues the amendment is either procedural or remedial because it provides a means

for individuals to get claims against insolvent insurance companies paid by KIGA. Procedural laws relate to the " 'machinery for carrying on the suit, including pleading, process, evidence, and practice' and 'the mode or proceedings by which a legal right is enforced, that which regulates the formal steps in an action.' " 257 Kan. at 366. It is clear that this amendment was not procedural. But it is more difficult to determine whether the amendment was substantive or remedial.

Substantive laws give or define the right, give the right or denounce the wrong, or create liability against a defendant for a tort committed. 257 Kan. at 366. The two most recent cases finding an amendment was substantive pertained to amendments extinguishing a cause of action. In *Fleischer*, the issue was whether the holder of an accrued tort action had a vested property right in that cause of action before it reached final judgment. This court held there was a vested right under the facts. 257 Kan. at 374. In *Kelly v. VinZant*, 287 Kan. 509, 197 P.3d 803 (2008), this court held an amendment eliminating a cause of action under the Kansas Consumer Protection Act against a medical provider for negligence was substantive because the amendment excluded a group previously liable under that Act. 287 Kan. at 521.

Remedial statutes " 'reform or extend existing rights, and having for their purpose the promotion of justice and the advancement of public welfare and of important and beneficial public objects, such as the protection of the health, morals, and safety of society, or of the public generally.' " *In re Estate of Brown*, 168 Kan. 612, 617, 215 P.2d 203 (1950). K.S.A. 2010 Supp. 40-2910 is more appropriately characterized as reforming the terms of an existing right because it changed the types of coverage a claimant was required to exhaust—effectively broadening the circumstances in which KIGA is allowed to offset other insurance payments. It did not create or extinguish the previous statute's requirement that a person claiming a recovery from KIGA exhaust other insurance coverage. Therefore, we conclude it is a remedial statute.

Historically, this finding would terminate the vested rights analysis because courts grouped procedural and remedial laws together under the rule that there is no vested right in any particular remedy

or method of procedure. *Fleischer,* 257 Kan. at 366. But this court recognized that a remedial statute could affect a vested right in *Owen Lumber Co.* There the court held that the legislature may retroactively modify remedies by which rights are enforced, unless the modification has the practical effect of abolishing the right. 276 Kan. at 225. We cited the following explanation from a commentator:

" 'The [United States Supreme] Court has recognized that the removal of all or a substantial part of the remedies for enforcing a private contract may have the same practical effect as an explicit denial of the right. Thus the relevant factor in determining the weight to be given to the extent to which a preexisting right is abrogated is not whether the statute abolishes rights or remedies, but rather the degree to which the statute alters the legal incidents of a claim arising from a preenactment transaction; the greater the alteration of these legal incidents, the weaker is the case for the constitutionality of the statute.' Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation,* 73 Harv. L. Rev. 692, 711-12 (1960)." 276 Kan. at 223.

Since a statute may be remedial and affect a vested right, the first factor is not determinative of the vested rights analysis. The first factor (the nature of the right) must be balanced against the others, including how the right was affected, whether a substitute remedy was provided, and the public interest furthered by the legislation. 276 Kan. at 227.

Applying these factors in concert supports a finding that Brennan had a vested right for three reasons. First, the statutory amendment extinguished Brennan's right to recover from KIGA and there was no substitute remedy with the insolvent insurance policy. Second, the Guaranty Act's stated purpose is to avoid financial loss to claimants or policyholders, and the entire statutory scheme is designed to cover the obligations of insolvent insurance companies while sharing the burden from those obligations among all member insurers. Third, the strong statutory language reciting that KIGA was "deemed the insurer to the extent of its obligations on the covered claims" and "obligated to the extent of the covered claims" indicate a statutory right arose at the time PHICO was declared insolvent. K.S.A. 40-2906(a)(1), (2).

As a final point, KIGA argues the general principal that a plaintiff has no vested right in any rule of law to remain unchanged for his or her benefit. But in *Fleischer*, this court held that rule applies to prospective amendments, not to the retroactive application of legislation to an accrued and pending claim. 257 Kan. at 367-68. KIGA's argument is without merit.

We find the 2005 amendment adversely impacted a vested right, thereby violating Brennan's due process rights.

*Remedy for Unconstitutional Retroactive Amendment*

Our holding that the 2005 amendment's retroactive application violates due process requires us to determine next the proper remedy, *i.e.*, whether the retroactivity provision is severable from the other statutory provisions enacted in 2005. In *Felten Truck Line v. State Board of Tax Appeals*, 183 Kan. 287, 300, 327 P.2d 836 (1958), this court stated the following test:

"Whether the court may sever an unconstitutional provision from a statute and leave the remainder in force and effect depends on the intent of the legislature. If from examination of a statute it can be said that the act would have been passed without the objectionable portion and if the statute would operate effectively to carry out the intention of the legislature with such portion stricken, the remainder of the valid law will stand. Whether the legislature had provided for a severability clause is of no importance. This court will assume severability if the unconstitutional part can be severed without doing violence to legislative intent."

We hold the retroactivity provision in the 2005 amendment is severable and Brennan's rights are governed by the preamended statute. Therefore, we affirm the district court's entry for judgment against KIGA without allowing an offset for Brennan's medical insurance benefits received. The remaining provisions in the 2005 amendment are unaffected by our holding.

Having determined the retroactivity provision violates due process and Brennan's rights are governed by the preamended K.S.A. 40-2910, this court does not need to reach Brennan's equal protection argument. See *Smith v. Kansas Dept. of Revenue*, 291 Kan. 510, 519, 242 P.3d 1179 (2010) (Appellate courts avoid making unnecessary constitutional decisions when there is a valid alternative ground for relief.).

Affirmed.

DAVIS, C.J., AND LUCKERT, J., not participating.

GREENE, C.J., and MALONE, J., assigned.