IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,267

LUKE GANNON, BY HIS NEXT FRIENDS AND GUARDIANS, *et al.*,

*Appellees*,

V.

STATE OF KANSAS, *Appellant.*

SYLLABUS BY THE COURT

1.

The Kansas Constitution receives its force from the express will of the people and serves as the supreme and paramount law of the state.

2.

Through Article 6 of their constitution, the people of Kansas expressly assigned duties to the legislature that both empower and obligate it to make suitable provision for finance of the educational interests of the state.

3.

The supreme court has the power and duty to review legislative enactments and to ensure the legislature's compliance with its duty under Article 6 of the Kansas Constitution.

**4.**

To determine compliance with the equity requirement in Article 6, Kansas courts consider whether school districts have reasonably equal access to substantially similar educational opportunity through similar tax effort.

**5.**

A party asserting compliance with a court decision ordering remedial action bears the burden of establishing such compliance. Although untested legislation normally enjoys a presumption of constitutionality, the presumption no longer applies when the legislative action is in response to a court order.

**6.**

Based on the record before this court, the State has carried its burden to show it has cured the unconstitutional inequities in capital outlay that were affirmed to exist in *Gannon v. State*, 303 Kan. 682, 368 P.3d 1024 (2016).

**7.**

Based on the record before this court, the State has not carried its burden to show it has cured the unconstitutional inequities in the local option budget and supplemental general state aid that were affirmed to exist in *Gannon v. State*, 303 Kan. 682, 368 P.3d 1024 (2016).

**8.**

The test for severability in Kansas is well established: Whether the court may sever an unconstitutional provision from a statute and leave the remainder in force and effect depends on the intent of the legislature. If from examination of a statute it can be said that (1) the act would have been passed without the objectionable portion and (2) if the statute would operate effectively to carry out the intention of the legislature with such portion stricken, the remainder of the valid law will stand. This court will assume

severability if the unconstitutional part can be severed without doing violence to legislative intent.

9.

The presence of a severability clause is direct evidence of legislative intent. A severability clause within an act creates a presumption of severability but is not dispositive.

10.

Based on the record before us, this court cannot conclude that the legislature would have passed the Classroom Learning Assuring Student Success Act without the inclusion of the unconstitutional provisions.

11.

Based on the record before us, this court cannot conclude severance of the unconstitutional provisions would allow the remainder of the Classroom Learning Assuring Student Success Act to operate effectively to carry out the intention of the legislature.

Appeal from Shawnee District Court; FRANKLIN R. THEIS, ROBERT J. FLEMING, and JACK L. BURR, judges. Opinion filed May 27, 2016. Senate Substitute for House Bill 2655 is not in compliance with the February 11, 2016, opinion of this court and fails to remedy the constitutional infirmities in the Classroom Learning Assuring Student Success Act (CLASS), K.S.A. 2015 Supp. 72-6463 *et seq.*, identified in that opinion.

*Stephen R. McAllister*, solicitor general, argued the cause, and *Jeffrey A. Chanay*, chief deputy attorney general, *M.J. Willoughby*, assistant attorney general, *Dwight R. Carswell*, assistant solicitor general, *Bryan C. Clark*, assistant solicitor general, and *Derek Schmidt*, attorney general, were with him on the brief for appellant State of Kansas; *Arthur S. Chalmers*, *Gaye B. Tibbets*, *Jerry D. Hawkins*, and *Rachel E. Lomas*, of Hite, Fanning & Honeyman, LLP, of Wichita, were with him on the brief for appellant State of Kansas.

*Alan L. Rupe*, of Lewis Brisbois Bisgaard & Smith LLP, of Wichita, argued the cause, and *Jessica L. Skladzien* and *Mark A. Kanaga*, of the same firm, and *John S. Robb*, of Somers, Robb & Robb, of Newton, were with him on the brief for appellees.

*Per Curiam*:  This case requires us to determine whether the State has met its burden to show that recent legislation brings the State's K-12 public school funding system into compliance with Article 6 of the Kansas Constitution. We hold it has not.

On February 11, 2016, we affirmed the holding of the three-judge district court panel that found changes made to the State's K-12 funding system through enactment of the Classroom Learning Assuring Student Success Act of 2015 (CLASS) violated the equity component of Article 6, § 6(b) of the Kansas Constitution. *Gannon v. State*, 303 Kan. 682, 746, 368 P.3d 1024 (2016) (*Gannon II*). Specifically, we determined the operation of capital outlay state aid and local option budget (LOB) supplemental general state aid, as formulated under CLASS, still allowed inequitable distribution of funding among school districts that we had held unconstitutional in *Gannon v. State,* 298 Kan. 1107, 319 P.3d 1196 (2014) (*Gannon I*). 303 Kan. at 729-33.

After affirming the panel's decision, we stayed our mandate "to give the legislature a second, and substantial, opportunity to craft a constitutionally suitable solution and minimize the threat of disruptions in funding for education." *Gannon II*, 303 Kan. at 741. In April 2016, lawmakers responded by passing Senate Substitute for House Bill No. 2655 (H.B. 2655). See L. 2016, ch. 45.

H.B. 2655 restores the prior formula for capital outlay state aid we identified as a permissible cure for the inequities found in that funding mechanism. *Gannon II*, 303 Kan. at 710-11. But the new law, for the first time, also applies the same capital outlay aid formula to LOB supplemental general state aid. L. 2016, ch. 45, sec. 3. As conceded by

4

the State, application of the capital outlay aid formula to LOB funding results in significant reductions in overall supplemental general state aid to the vast majority of school districts.

Because of this result, the new law includes a "hold harmless" provision creating a new "equalization aid" entitlement for the 2016-17 school year. L. 2016, ch. 45, sec. 1(a). Specifically, the law authorizes such equalization aid—to those districts receiving reduced funding under the new bill—in an amount equal to their loss. L. 2016, ch. 45, sec. 5. The new law also moves from the State Finance Council to the Kansas State Board of Education (State Board) an "extraordinary need fund" of approximately $15 million and permits the State Board's disbursement of those funds to further decrease disparity among the districts. L. 2016, ch. 45, secs. 1(e), 9.

We ordered both parties to brief whether the legislative action—H.B. 2655—remedied the inequities that *Gannon II* affirmed to exist in CLASS. Additionally, the parties were directed to discuss the proper judicial remedy if we ruled the new law failed to comply with our *Gannon II* decision.

In this remedial stage, the State asserts: (1) H.B. 2655 cures the inequities found in the capital outlay state aid by restoring and fully funding the capital outlay aid formula we previously held constitutional; (2) H.B. 2655 cures the inequities found in the LOB funding by applying the same capital outlay aid formula to supplemental general state aid. It additionally argues any remaining inequities in the LOB funding system are cured through operation of the hold harmless provision and extraordinary need fund; and (3) If H.B. 2655 fails to cure the inequities we found in CLASS, the proper remedy is severing the offending provisions and allowing the remainder of CLASS to operate throughout the 2016-17 school year.

5

Plaintiffs do not contest the State's first argument. They do, however, assert that H.B. 2655 worsens, rather than cures, the inequities in LOB funding affirmed to exist in *Gannon II*. They further argue that we should not sever any offending provisions but hold the entirety of H.B. 2655 unconstitutional, lift our stay of the panel's extensive remedial orders, and grant them attorney fees.

After careful consideration of the legislative record and arguments from both sides, we hold the following:

1. H.B. 2655 cures the capital outlay inequities affirmed to exist in *Gannon II*.
2. H.B. 2655, which includes the hold harmless and extraordinary need provisions, fails to cure the LOB inequities affirmed to exist in *Gannon II*.
3. The unconstitutional LOB funding mechanism is not severable from CLASS, the general statutory scheme for K-12 public school finance, thus making CLASS unconstitutional.
4. The panel's remedial orders remain stayed, and jurisdiction of this case is retained by this court.
5. The plaintiffs are not entitled to attorney fees.

Each of these holdings will be explained below.

FACTS

The procedural and factual history of this case was extensively outlined in both *Gannon I* and *Gannon II*. See *Gannon I*, 298 Kan. at 1112-18; *Gannon II*, 303 Kan. at 686-98. Accordingly, we limit this section only to those facts necessary to our holding.

The School District Finance and Quality Performance Act (SDFQPA), K.S.A. 72-6405 *et seq*., was the comprehensive statutory plan for K-12 public school finance in

6

Kansas at the outset of the underlying lawsuit filed in 2010. See *Gannon II*, 303 Kan. at 686. The basic source of funding within the SDFQPA was provided by the State through "general state aid" entitlements funded by a required 20-mill levy for each district. K.S.A. 2014 Supp. 72-6431. Each district's general state aid was calculated by multiplying a dollar amount known as "base state aid per pupil" (BSAPP) by the district's population of enrolled students. K.S.A. 2014 Supp. 72-6410. Full-time enrollment was weighted by factors recognized to increase the cost of education per pupil, *e.g.*, number of special needs students. K.S.A. 2014 Supp. 72-6407; K.S.A. 2014 Supp. 72-6410.

In addition to this basic payment, the legislature allowed districts "local effort" revenue-raising authority to fund capital outlay expenditures and an LOB. K.S.A. 2014 Supp. 72-8801; K.S.A. 2014 Supp. 72-6433. In general, both were funded through optional additional mill levies on property in the district. See *Gannon II*, 303 Kan. at 687-88. The legislature capped the additional levies for capital outlay expenses at 8 mills per district, while the revenues produced by the additional LOB mill levy could not exceed an amount equal to a set percentage—currently 33%, historically as low as 25%—of a district's general state aid. K.S.A. 2014 Supp. 72-8801; K.S.A. 2014 Supp. 72-6433. Districts could use capital outlay funds only for limited purposes, *e.g.*, improvements such as building construction and maintenance, equipment purchases, and other authorized investments. K.S.A. 2014 Supp. 72-8804. On the other hand, LOB funds had few restrictions and districts could use them to supplement their general state aid. K.S.A. 2014 Supp. 72-6433.

Because of the dissimilarities among the overall property values of the 286 school districts, these local revenue-raising programs created inequities in the amount of funds districts could generate and the tax effort required to do so. A district with high property value, for example, implementing the maximum 8-mill levy, generated more capital outlay funds than a property-poor district doing the same. Similarly, a property-wealthy

7

district fully funding a 15% LOB could do so with less tax effort, *i.e.*, a lower mill levy, than a district with lower property values. See *Gannon I*, 298 Kan. at 1175-88.

To remove these disparities, the legislature implemented programs through SDFQPA intended to equalize property-poor districts' local revenue-raising authority. The State Board calculated an assessed valuation per pupil (AVPP) for each district in the State by dividing the total assessed property value of a district by its schools' enrollment population. The State Board ranked all the districts by their AVPP—from low to high. K.S.A. 2014 Supp. 72-8814; K.S.A. 2014 Supp. 72-6434. This AVPP schedule was then utilized in two distinct formulas to calculate what was commonly called "equalization aid" for the capital outlay and LOB funding. See *Gannon I*, 298 Kan. at 1180, 1185.

For capital outlay, a "state aid percentage factor" for each district was established at 25%. This factor increased 1% for every $1,000 a district fell below the median AVPP with a cap of 100%, and decreased 1% for every $1,000 it rose above the median. The resulting percentage factor was then multiplied by the district's total capital outlay mill levy revenue, and the product was provided to the district as capital outlay state aid. K.S.A. 2014 Supp. 72-8814; *Gannon I*, 298 Kan. at 1176.

For the LOB, the State Board multiplied the amount of a district's LOB-generated revenue by a ratio—obtained from dividing the district's AVPP by the one located at the 81.2 percentile of the AVPP schedule and then subtracting the quotient from 1. The resulting product was provided to the district as supplemental general state aid. K.S.A. 2014 Supp. 72-6434; *Gannon II*, 303 Kan. at 720.

In 2010, the State began withholding capital outlay state aid. See 298 Kan. at 1177. In addition, supplemental general state aid was reduced from the amount required by its formula, which resulted in prorated payments. See 298 Kan. at 1183. Districts not qualifying for aid, or eligible only for a nominal amount, were unaffected by these

8

reductions and were able to keep generating their same level of local revenue without added tax effort, *i.e.*, without increased mill levies. See 298 Kan. at 1181, 1187-88.

In 2010 plaintiffs sued the State in Shawnee County District court, alleging K-12 public school funding in Kansas was unconstitutionally inadequate. The plaintiffs additionally claimed the system was unconstitutionally inequitable because reduction or elimination of state aid under the capital outlay and LOB funding mechanisms disproportionately affected the local revenue-raising ability of districts with a low AVPP, while districts with a higher AVPP saw little or no change in such ability. After a 16-day bench trial, the three-judge panel agreed with the plaintiffs and held the changes to the school finance system violated Article 6, § 6(b) of the Kansas Constitution. See Kan. Const., art. 6, § 6(b) ("The legislature shall make suitable provision for finance of the educational interests of the state.").

On appeal, we confirmed Article 6, § 6(b) contains adequacy and equity components and outlined standards for both. *Gannon I*, 298 Kan. 1107. For adequacy, we adopted the seven-prong standard initially formulated by the Supreme Court of Kentucky in *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 212 (Ky. 1989), 298 Kan. at 1170, and later essentially codified in K.S.A. 72-1127(c). See 298 Kan. at 1165-67. For equity, we determined "[s]chool districts must have reasonably equal access to substantially similar educational opportunity through similar tax effort." 298 Kan. at 1174.

We affirmed the panel's ruling that found elimination of the capital outlay state aid and proration of supplemental general state aid created unfair, wealth-based—and unconstitutional—disparities among the districts. The case was remanded for the panel to reconsider the adequacy portion of its ruling under *Rose*, while the equity portion was returned for remedial action. 298 Kan. at 1111.

9

As guidance to the panel, we specified the State could cure the equity issue by fully funding the existing formulas for capital outlay state aid and supplemental general state aid. If the State chose to cure the issue with less than full funding, or by adopting other equalization techniques, the panel was instructed to evaluate the curative action under the test set out in our opinion. 298 Kan. at 1198-99.

After the case returned to the panel, the 2015 legislature ultimately repealed the SDFQPA and replaced it with a new comprehensive public school funding system known as CLASS. K.S.A. 2015 Supp. 72-6463 *et seq*. The new law made substantial changes to the formulas used to calculate both capital outlay state aid and supplemental general state aid. *Gannon II*, 303 Kan. at 685.

For capital outlay state aid, the initial percentage factor began at 75% and decreased 1% for every $1,000 a district rose above the State Board's lowest calculated AVPP. After application of this new formula, all eligible districts' capital outlay state aid was reduced, and 28 districts lost eligibility altogether. See 303 Kan. at 712-15.

For supplemental general state aid, the legislature directed the State Board to organize aid-qualifying districts on its AVPP schedule into five equal quintiles from low AVPP to high. In other words, each quintile represented a 20% AVPP span. The SDFQPA formula for determining supplemental general state aid was then utilized. If the school district fell in the lowest quintile, it would receive 97%—not 100%—of the calculated aid. If it was in the second lowest quintile it would receive 95%, continuing to the third lowest receiving 92%, the fourth lowest receiving 82%, and the highest receiving 72%. In simplest terms, the legislature reduced the LOB aid (supplemental general state aid) of the poorest 20% of school districts by 3%, the next 20% by 5%, and so on until the wealthiest aid-receiving districts were reduced by 28%. See L. 2015, ch. 4, sec. 38; 303 Kan. at 721.

CLASS also disbursed base funding for school years 2015-16 and 2016-17 through a new "block grant" formula. The funding matched the amount equal to a district's total general state aid plus the capital outlay state aid and supplemental general state aid it previously received in school year 2014-15. K.S.A. 2015 Supp. 72-6465. Essentially, the equalizing funds of the capital outlay and LOB funding systems were frozen at 2014-15 levels as calculated under the new formulas and then rolled into a 2-year block grant payment to the districts for school years 2015-16 and 2016-17. See 303 Kan. at 694.

The panel held that the changes made by CLASS continued to allow unconstitutional funding inequities to exist among the districts. Specifically, the reduced LOB supplemental general state aid required the less-property-wealthy districts to increase their local mill levies to cover the loss of such aid. In comparison, the wealthier non-aid-qualifying districts experienced no change in their local levy to stay at the same revenue level. Similarly, the negative effects of the new capital outlay state aid formula were limited to aid-qualifying districts, while non-aid-qualifying districts remained unharmed. In addition to these holdings on equity, the panel also held CLASS unconstitutionally inadequate. See *Gannon II*, 303 Kan. at 696.

On appeal in *Gannon II*, we bifurcated the equity and adequacy portions of the panel's rulings and first examined equity. 303 Kan. at 689. We held the State failed to cure the inequities affirmed to exist in *Gannon I* for both capital outlay and LOB funding. 303 Kan. at 720, 726. Specifically, we found the reduction in aid for both programs negatively affected the property-poor districts, while leaving property-rich districts unscathed. See 303 Kan. at 719, 726. In addition, because CLASS froze aid payments at 2014-15 levels but continued to allow districts to increase their capital outlay levies and LOB budgets, districts without a need for aid continued to have greater ability to raise additional local revenue than their less property-wealthy counterparts. See 303 Kan. at

11

729-32. We agreed with the panel that these changes worsened rather than cured K-12 funding inequities affirmed to exist in *Gannon I*. See 303 Kan. at 718-33.

Instead of remanding the case to the panel for it to begin implementing its broad remedial orders, we stayed the issuance of our mandate and retained jurisdiction over the appeal to give the legislature time to respond to our decision and enact a cure for the inequities found to exist in CLASS. 303 Kan. at 746. We advised the State that "[o]ne obvious way [it] could comply with Article 6 would be to revive the relevant portions of the previous school funding system and fully fund them within the current block grant system." 303 Kan. at 743. We further counseled that if the State chose a different route, "any other funding system it enacts must be demonstrated to be capable of meeting the equity requirements of Article 6." 303 Kan. at 743.

We cautioned:

"In short, if by the close of fiscal year 2016, ending June 30, the State is unable to satisfactorily demonstrate to this court that the legislature has complied with the will of the people as expressed in Article 6 of their constitution through additional remedial legislation or otherwise, then a lifting of the stay of today's mandate will mean no constitutionally valid school finance system exists through which funds for fiscal year 2017 can lawfully be raised, distributed, or spent.

. . . .

"Without a constitutionally equitable school finance system, the schools in Kansas will be unable to operate beyond June 30." 303 Kan. at 743-44.

The legislature passed H.B. 2655 in April 2016 in response to our decision and the bill was signed by the governor. Among other things, it makes major changes to the aid

12

programs at issue in *Gannon II*. Those changes and their effects are discussed in detail below.

ANALYSIS

Issue 1: *H.B. 2655 does not comply with the equity requirement of Article 6.*

In response to our decision in *Gannon II,* the State filed a "Notice of Legislative Cure" on April 7, 2016. Submitted with this notice was the legislative record, including documents and information made available to lawmakers during their deliberative process. In a similar situation 10 years ago, we recognized the submitted documents had "not been subjected to the fact-finding processes of litigation through which the parties were permitted to examine [their] validity and accuracy." *Montoy v. State,* 282 Kan. 9, 21, 138 P.3d 755 (2006) (*Montoy IV*). But we considered such information as "part of the legislative history" and used it in determining legislative intent, relevant to whether the cure complied with Article 6. 282 Kan. at 21-22; see *Montoy v. State*, 279 Kan. 817, 825, 112 P.3d 923 (2005) (*Montoy III*) ("[T]his court's retained jurisdiction allows a review to determine if there has been compliance with our opinion."); see also *Gannon II*, 303 Kan. at 743 ("[T]he State would help its case by showing its work in how it determined that any . . . proposed solution complies with *Gannon I*."). We will consider the submitted documents for these purposes.

*Burden of Proof*

"'[A] party asserting compliance with a court decision ordering remedial action bears the burden of establishing that compliance . . . .'" *Gannon II*, 303 Kan. at 709 (quoting *Montoy III*, 279 Kan. at 826). Although untested legislation normally enjoys a presumption of constitutionality, the presumption no longer applies when the legislative

13

action is in response to a court order. 303 Kan. at 708-09. Accordingly, "[t]he State has the express burden to show compliance." 303 Kan. at 709.

*Discussion*

*Equity Standard*

In *Gannon I* we clarified the equity standard of Article 6, § 6(b) by stating: "School districts must have reasonably equal access to substantially similar educational opportunity through similar tax effort." 298 Kan. at 1175. We have never required precise standards for equity compliance or applied a zero tolerance test. But we have "rejected legislation that increased or exacerbated inequities among districts . . . ." *Gannon v. State*, 303 Kan. 682, 709, 368 P.3d 1024 (2016) (*Gannon II*); see *Gannon v. State*, 298 Kan. 1107, 1110, 319 P.3d 1196 (2014) (*Gannon I*).

In our analysis, we do not dictate to the legislature how it should constitutionally fund K-12 public school education; we only review its efforts to ensure they do not run afoul of the Kansas Constitution. See *Gannon II*, 303 Kan. at 734-35 ("We . . . reaffirm[] the legislature's power and duty to create a school funding system. . . . [W]e have also consistently affirmed our own power and duty to review legislative enactments for constitutional compliance . . . .").

Our review of legislation includes an acknowledgment that a system of school finance allowing local revenue-raising authority, such as assessing LOB mill levies on property within a school district, will almost certainly create wealth-based disparities among the districts. This reality, as confirmed in the numerous school finance cases litigated in our courts, has been the result of policy decisions made by the legislature. See *Gannon I*, 298 Kan. at 1173-74 ("'legislat[ure's] increase in the LOB cap exacerbates the wealth-based disparities between districts'") (quoting *Montoy III*, 279 Kan. at 840).

14

Indeed, in recent years the legislature has shifted its emphasis from funding BSAPP with the 20-mill levy on all districts—as mandated by K.S.A. 72-6431—to a greater reliance on district-elective LOB's. The LOB cap held steady at 25% from 1992 until 2005-06, but from then until CLASS' passage in 2015, the LOB cap increased to 33%. Since 2005-06, BSAPP has effectively been reduced from $4,257 to $3,838. See, *e.g.*, K.S.A. 2005 Supp. 72-6410; K.S.A. 2014 Supp. 72-6410; see also *Gannon II*, 303 Kan. at 691-92, 720, 731-33 (BSAPP decreased as the LOB cap increased). As Mark Tallman, Associate Executive Director for the Kansas Association of School Boards, described to the 2016 legislature, "[O]ne of the challenges we see is that the more local funding you allow, the greater your challenge is to equalize it because there is such a range of local sources."

Accordingly, if local funding is to continue, this disparate effect has to be limited so it complies with Article 6. See *Gannon I*, 298 Kan. at 1174 (quoting *Montoy III*, 279 Kan. at 840). In sum, the State may not allow children to receive disparate levels of educational opportunity on the basis of wealth, especially the property wealth of the district where they happen to live. See *Gannon I*, 298 Kan. at 1174 ("Education in Kansas is not restricted to that upper stratum of society able to afford it.").

With these principles in mind we address the State's arguments.

*H.B. 2655 cures the capital outlay inequities affirmed to exist in* Gannon II.

Section four of H.B. 2655 revives and fully implements the prior SDFQPA capital outlay state aid formula which we essentially had held constitutional for that purpose in *Gannon I*: "If . . . the legislature fully funds the capital outlay provision as contemplated in K.S.A. 2013 Supp. 72-8814, the panel need not take any additional action on this issue." 298 Kan. at 1198; see *Gannon II*, 303 Kan. at 743. Specifically, the new law, L.

15

2016, ch. 45, sec. 4, again uses a 25% factor that increases 1% with every $1,000 below the median a school district falls on the State Board AVPP schedule and decreases 1% for every $1,000 rising above the median with a cap of 100%.

Capital outlay state aid is also removed from the general state aid block grant. L. 2016, ch. 45, sec. 7(b). This removal allows aid to be calculated by the total mill levy actually set by a school district, instead of being frozen at the levy level imposed before the enactment of CLASS. See L. 2016, ch. 45, secs. 4, 7. As was demonstrated by the record and confirmed by the State in oral arguments, this change allows aid-qualifying districts that raise their mill levies to receive corresponding additional capital outlay state aid.

The aid is funded by the legislature appropriating $50.7 million to the "capital outlay state aid fund." L. 2016, ch. 45, sec. 1(b). The legislative record reflects this amount was estimated by the State Board—subject to later adjustments—as sufficient for full funding of capital outlay aid for school year 2016-17.

The State Board is tasked with calculating the total aid required for all districts and certifying that amount in the form of a demand transfer against the state general fund. L. 2016, ch. 45, sec. 4(c). A backup for this capital outlay aid is created in section 1(b) that allows an increase in the amount appropriated equal to the $15.1 million set aside for the extraordinary need fund. L. 2016, ch. 45, sec. 1(b), (e). In other words, if the State Board discovers the amount of capital outlay state aid needed is more than the $50.7 million appropriated, it may create additional demand transfers shifting funds from extraordinary need to capital outlay state aid. L. 2016, ch. 45, sec. 1(e).

According to data compiled by the Kansas Legislative Research Department (KLRD) and supplied to lawmakers, reverting from CLASS to the previous SDFQPA formula increases capital outlay state aid in the 2016-17 school year by approximately

16

$23.5 million statewide. The overwhelming majority of aid-qualifying districts will see substantial increases in such aid for the upcoming year, and the restored SDFQPA formula significantly decreases disparity between aid-qualifying and non-aid-qualifying districts.

Based on our review of the language of the legislative materials submitted for consideration, the State has met its burden to establish that it successfully responded to our constitutional equity concerns in capital outlay aid. By reviving and fully funding the prior formula we had approved in *Gannon I*—and confirmed in *Gannon II*—H.B. 2655 complies with our *Gannon II* decision in this area. See *Gannon II*, 303 Kan. at 709 (State has express burden to show compliance during the remedy stage).

*H.B. 2655 fails to cure the LOB inequities affirmed to exist in* Gannon II.

In *Gannon II*, we considered the changes made to the LOB aid formula by CLASS and determined they increased and exacerbated inequity between the poorer and wealthier districts. Specifically, we affirmed the panel's conclusion that implementation of the quintile formula for calculating supplemental general state aid reduced the abilities of aid-qualifying districts to fund their LOB while leaving wealthier districts' mill levy capabilities unscathed. Accordingly, we determined the distribution of LOB aid under CLASS was inequitable and required the State to respond with a cure. 303 Kan. at 730-33, 741. We held out reversion to the pre-CLASS aid formula from the SDFQPA as a way the legislature could fix the inequitable distribution. 303 Kan. at 743.

But instead of reverting to the formula as it existed prior to CLASS, the legislature adopted the SDFQPA capital outlay state aid formula and applied it to LOB supplemental general state aid. L. 2016, ch. 45, sec. 3. The State readily admits using that formula to calculate supplemental general state aid significantly reduces not only the overall LOB aid—compared to the amounts calculated under both the LOB aid formulas in the

17

SDFQPA and in CLASS—but also the number of school districts qualifying for it. But it points to the new "hold harmless" fund as well as to CLASS' 1-year-old "extraordinary need" fund and argues these provisions sufficiently mitigate any increase in disparity among the districts.

Based on our review of the legislative record and consideration of the parties' arguments, we hold the State has failed to meet its burden on this issue. *Gannon II*, 303 Kan. at 709. Simply put, use of the former capital outlay aid formula for the LOB funding system increases and exacerbates the disparity among districts. As more fully explained below, the legislature's use of the hold harmless provision and extraordinary need fund in H.B. 2655 admittedly mitigates this increase in inequity. But at most they bring aid-qualifying districts back up to LOB distribution levels found inequitable in *Gannon II*. In addition, the new law does not require hold harmless funds to replace lost supplemental general state aid in a district's LOB fund. Rather, hold harmless money is deposited into a district's general fund. L. 2016, ch. 45, sec. 5(c). This action obviously leaves aid-qualifying districts with a financial gap between the total funds that would have been generated through their LOB and the depleted funds actually in their LOB account. Aid-qualifying districts will now have the option of filling this gap—up to their authorized LOB percentage levels—through new mill levies that are not equalized by the State.

These activities will likely result in wealthier aid-qualifying districts raising additional local revenue with less tax effort than poorer aid-qualifying districts. The overall result of the new LOB funding mechanism under H.B. 2655 is therefore an exacerbation of inequity among the districts and a failure to satisfactorily respond to our *Gannon II* decision.

After the legislature applied the SDFQPA capital outlay state aid formula to LOB supplemental general state aid, it appropriated $367.5 million. L. 2016, ch. 45, sec. 1(a). The Kansas State Department of Education (KSDE) estimated this was the amount

18

needed to fully fund the projected supplemental general state aid for school year 2016-17 under the capital outlay formula. But if the demands on the LOB aid fund exceed the appropriations, the State Board may transfer monies from the extraordinary need fund's $15.1 million until its exhaustion—just as its monies can be transferred to the capital outlay aid fund should it be exhausted. L. 2016, ch. 45, sec. 1(e). And like the capital outlay state aid system, supplemental general state aid is now independent of the block grant. L. 2016, ch. 45, sec. 7(b).

Applying the capital outlay aid formula to supplemental general state aid decreases the overall aid going to qualifying districts—not only per the calculations under the SDFQPA's LOB formula but also under the CLASS "quintile" system held unconstitutional in *Gannon II*. Specifically, the KSDE data in the legislative record shows that the amount of supplemental general state aid for 2016-17 reduces the aid provided in the 2015-16 school year under CLASS by $82,908,792.

Under both prior formulas—SDFQPA and CLASS—the point to which districts were equalized on the State Board schedule was set at the 81.2 percentile. *Gannon II*, 303 Kan. at 720-21. Under the capital outlay aid formula, however, the equalization point becomes significantly lower and set to the median AVPP on the State Board's AVPP schedule. This application has the effect of substantially decreasing the number of aid-qualifying school districts and reducing the amount of equalization aid to those that remain eligible. According to State Board data in the legislative record, for the 2016-17 school year 197 districts will experience reduced supplemental general state aid and 35 districts will lose aid altogether. As specific examples, plaintiff Wichita School District will experience more than $6 million in decreased supplemental general state aid, and plaintiff Kansas City, Kansas School District will incur a loss of more than $2.5 million. While the property-poor districts suffer this loss, the wealthier districts with no need for supplemental general state aid experience no change in their ability to fund their LOB.

19

Nevertheless, the State argues that because we have previously found the prior capital outlay formula constitutionally permissible under Article 6 when applied to capital outlay state aid, we should also find it constitutionally permissible when applied to LOB supplemental general state aid. While this argument is superficially attractive, a deeper and comprehensive review discloses it fails to account for fundamental differences between the programs—differences the State's counsel acknowledged during oral arguments and that we have previously found relevant in considering equity compliance. See *Montoy IV*, 282 Kan. at 17.

By law, school districts may only use capital outlay funds for capital improvements such as building costs, equipment purchases, and other authorized investments. K.S.A. 2014 Supp. 72-8804. And the amount of money raised by a district for these limited purposes is further restricted to what the district can generate within the legislatively prescribed 8-mill cap. K.S.A. 2014 Supp. 72-8801.

LOB funds, however, differ in both magnitude and flexibility. The revenues generated by a district's maximum LOB, *i.e*., 33% of its state financial aid entitlement, are significantly greater than what an 8-mill capital outlay levy can generate. Moreover, LOB funds may supplement general state aid by being used for a district's basic educational expenses. K.S.A. 2014 Supp. 72-6433.

For example, during the 2014-15 school year, the Wichita School District had a 30% LOB (below the 33% cap) generating a total of $111 million through its additional local effort mill levy, of which $59 million was supplemental general state aid. The district also had an 8-mill capital outlay levy generating a total of $28 million, of which $7.6 million was capital outlay state aid. Wichita's $111 million in LOB-generated funds were available for general use. But the $28 million in funds raised by its maximum 8-mill levy were restricted to the narrow class of expenses authorized under the capital outlay program. See K.S.A. 2014 Supp. 72-6433; K.S.A. 72-8804. In sum, LOB enhances a

20

district's ability to perform its basic function, while capital outlay, although necessary, is indirect and generates considerably smaller revenue.

This phenomenon was confirmed by several witnesses testifying before the legislature during consideration of the legislative cure, including Deputy Commissioner Dale Dennis of the KSDE:

"[S]ometimes we have a tendency to want to compare capital outlay with LOB, but capital outlay there is a difference. You have a cap. You can't go more than eight mills. So, if there's—it's equalization, why, *it's got to be within that eight mills*, *where the LOB about the average tax rate there is in the 19, 20 mill range. So, it's much larger and the dollars involved are much greater . . . .*" (Emphasis added.)

Mark Tallman indicated the same:

"The local option budget and capital outlay are, as you've heard, . . . local choices. Now, many districts would say no one is operating without I think at least 20 percent LOB or more. They would argue that a lot of local option budget really . . . isn't an option any more. There are districts that have no capital outlay. . . . *I would say LOB is different because we've really, we believe, folded LOB into general operations. We don't—I don't think any district would really say the local option budget is now just used for extras.* And, so, in that sense, what we—what we really have is every district has to levy 20 mills [required under K.S.A. 2014 Supp. 72-6431], and, then, every district has to levy some *other* mill rate *to fund that 25 to 30 percent of their budget*." (Emphasis added.)

As we previously observed, beginning in the 2005-06 school year, the legislature has steadily increased the LOB cap. And beginning in the 2009-10 school year, it has overall decreased the BSAPP from its 2005-06 levels. See, *e.g.*, K.S.A. 2005 Supp. 72-6410; *Gannon II*, 303 Kan. at 691-92, 720, 731-33. As a result of these legislative decisions to become increasingly dependent on local revenues for funding schools, districts now are required to rely more heavily on their LOB funds to perform their basic

21

functions. Indeed, the legislative record reveals that LOB funds now pay for nearly one-fourth of the districts' basic operating expenses.

We must conclude that applying the former capital outlay formula—to calculate supplemental general state aid—creates intolerable, and simply unfair, wealth-based disparities among the districts. While these disparities are acceptable when computing aid in the smaller and less flexible capital outlay arena, the degree of inequity among the districts is too great when considering that the LOB has developed into such a major source of basic, and versatile, educational funding.

*Hold Harmless Provision*

Because of the reduction of LOB aid (supplemental general state aid) under H.B. 2655 for the 2016-17 school year, the majority of districts will experience lower total funding amounts than the total amounts promised in the 2-year block grant of CLASS. To make up this loss, H.B. 2655 contains a "hold harmless" provision ensuring the changes do not result in a funding decrease from 2016-17 CLASS distributions. L. 2016, ch. 45, sec. 6. This mere restoration of funds is accomplished by a new payment to districts curiously labeled "school district equalization state aid." L. 2016, ch. 45, sec. 1(a).

The general trend among the districts for 2016-17 under the new law, with some exceptions, is for them to receive an increase in capital outlay state aid (based on reimplementation of the former formula) but a bigger decrease in supplemental general state aid after application of the former capital outlay state formula to the LOB funding mechanism. School districts experiencing a net reduction in overall funding based on these two changes are entitled to receive the hold harmless payment in an amount equal to their loss. L. 2016, ch. 45, sec. 5. Jason Long, the revisor who drafted the bill, explained this provision while answering questions during a legislative committee hearing on March 22, 2016:

22

"Rep. Kleeb: . . . I wanted to, Jason, have you go into Section 4 just a little bit and talk about this hold harmless aspect. In particular, so, we are holding districts that have this change due to this formula, we're holding them even with the financing, is that my understanding?

"Mr. Long: Yes. To the extent that because of the change in how the supplemental general state aid is being calculated under this bill, to the extent that their total supplemental general state aid and capital outlay state aid amount is less next year [2016-17] than what they received through the block grant this year [2015-16], Section 4 makes up that difference and provides that difference to the school district *so that they would receive the same amount as they received this year* [2015-16]." (Emphasis added.)

As an example of how the new payment would work, the KSDE showed that under the new law the Neodesha School District would receive an increase of $46,331 in capital outlay state aid but a $250,286 decrease in supplemental general state aid. The net loss of $203,955 would be covered by a hold harmless payment in that amount.

Consequently, the new hold harmless provision ensures aid-qualifying districts are brought back to their previously calculated 2016-17 school year CLASS distribution amounts. Lost funds under the newly substituted formula are simply repaid by hold harmless monies.

Despite there being no real change in the distribution of aid from 2015-16, the State points to a projected decrease in mill rate disparity among districts for the upcoming year as proof of compliance with our *Gannon II* decision. To support this conclusion, it primarily relies on two 1-page charts compiled by the Kansas Legislative Research Department and provided to lawmakers during their consideration of H.B. 2655. The charts divide the districts into five groups based upon AVPP wealth and show the difference in mills required in each to generate a 25% LOB. In the 2014-15 school year,

23

the mill disparity between the poorest and the wealthiest 20% after implementation of CLASS and its "quintile" LOB formula was 4.225. In the 2015-16 school year, the second year of applying the same formula, the disparity increased to 5.456. But for 2016-17, under H.B. 2655 the disparity is projected to decrease to 3.148.

The State failed in its brief, however, to demonstrate that this reduction in mill levy disparity was anything more than a result of normal fluctuations in the AVPP of districts. Such fluctuations are well known to the State and, in *Gannon II*, it cited the fluctuations as a basis for its inability to properly fund LOB supplemental general state aid. See 303 Kan. at 723-26. And, during recent oral arguments, the State admitted it was unable to demonstrate that the operation of H.B. 2655 is what would cause the projected reduction in mill rate disparity.

The legislative record also leads us to reject the State's argument. As mentioned, after the enactment and implementation of CLASS, the disparity between the poorest and the wealthiest 20% of districts setting a 25% LOB was 4.225 mills in 2014-15. And in the second year of CLASS, which froze funding distributions for all districts at prior levels, the disparity actually increased 1.231 mills to 5.456 in 2015-16.

As the plaintiffs point out, this mill increase was accompanied by a $16,684 increase in the difference between the wealthiest and poorest districts' groups' AVPP. But this difference in AVPP was reduced in the upcoming school year—2016-17—by $30,301, and the accompanying mill rate disparity decreased by 2.308 mills to 3.148. So they argue the decrease is more coincidence than anything else.

Eddie Penner, the staff member of Kansas Legislative Research Department who provided the information the State is relying on for its argument, confirmed the plaintiffs' observations that the mill levy differences can be caused by normal fluctuations in AVPP—and not changes in the amount of state aid:

24

"[T]he cost between [years 20]14-15 and [20]15-16, the difference there or even that increase because, as you recall, the amount of supplemental general state aid for those two years was the exact same based upon the block grant. And so that disparity is a result of—*that increase in disparity from 14-15 to 15-16, is essentially a result of the weighted assess evaluation and enrollment in schools* [AVPP] *have changed and nothing else. Because it isn't the result at all of the amount of state aid that was provided to those districts.*" (Emphasis added.)

Penner continued:

"So it just so happened that between 14-15 and 15-16, the wealthiest 20 percent of school districts in the state got, relatively speaking, a little wealthier and the poorest 20 percent of school districts in the state got, relatively speaking, a little poorer than they were the prior year and that caused that disparity to extend."

Moreover, the charts merely reflect averages which hide greater disparities contained inside. We observe that even within the five different groups of districts, data in the record from Mr. Penner shows that large mill disparities exist. For example, within the wealthiest district group, generating a "Non-State Portion of 25% Adopted LOB" for the Burlington School District (AVPP of $484,593) requires a 2014-15 mill levy of 4.359. And for the Brewster School District (AVPP $131,824), the same "Non-State Portion of 25% Adopted LOB" requires a mill levy for that identical time period of 21.802.

The same problem exists within the poorest district group. Generating a "Non-State Portion of 25% Adopted LOB" for the Valley Heights School District (AVPP of $46,243) requires a 2014-15 mill levy of 22.204. And for the Eudora School District, (AVPP $36,281), the same "Non-State Portion of 25% Adopted LOB" requires a mill levy for that identical time period of 14.101.

25

Based on the State's oral arguments and the record before us, the State has not persuaded us that the two single-page charts' decrease in mill levy disparity is attributable to anything enacted in H.B. 2655. *Gannon v. State*, 303 Kan. 682, 709, 368 P.3d 1024 (2016) (*Gannon II*) (State has express burden to show compliance during the remedy stage.).

In *Gannon II* we held the distribution of LOB funds under CLASS was unconstitutionally inequitable. 303 Kan. at 729. And the State admits that application of the SDFQPA capital outlay formula to supplemental general state aid drives LOB funding to aid-qualifying districts even further below those unconstitutional distribution amounts. The hold harmless provision, at most, merely returns those districts to CLASS 2016-17 distribution amounts. Accordingly, the hold harmless provision is not sufficient to cure the increased disparity created by using the former capital outlay formula to calculate supplemental general state aid.

Moreover, while the hold harmless provision for 2016-17 at most does give back what the new LOB formula takes away for that year, it replaces it in a way that actually increases disparity among aid-qualifying districts' ability to access additional LOB revenue. For aid-qualifying districts, supplemental general state aid makes up a significant portion of the district's LOB funds, so with the decrease in such aid under H.B. 2655, all aid-qualifying districts will experience some gap between the total funds that would have been realized through their LOB and the monies actually received to fund it.

While the hold harmless provision is meant to make up for this loss, the bill's terms dictate that the money not go into a district's LOB fund. Rather, it is deposited into a district's general fund. L. 2016, ch. 45, sec. 5(3)(c). This action maintains the gap between the total funds that would have been generated by the LOB—up to the district's authorized percentage level—and the money actually received in the LOB account. So a

26

choice is created for aid-qualifying districts:  They either can fill the gap with the hold harmless money or leave the hold harmless money in their general fund and fill the gap by raising even more—but not equalized—revenue through increased LOB mill levies until their cap is reached.

This choice was explained to legislators by Deputy Commissioner Dale Dennis as he answered their questions during their consideration of the bill:

> "Rep. Hutton:  [T]he last time we had this discussion it was apparent that the bulk of what was going back to some school districts was going to be really returning to taxpayers as property tax reduction. How does this approach jive up with—will this result in all this going still to property tax reductions or will this actually result in more money to the school districts?

> "Mr. Dennis:  No, it will not—this, the effect of this will not reduce property tax overall. The expenditures will stay about the same. . . . Now, the reason why I say property tax could go up, if the LOB goes—they're losing—they lose state aid in their LOB, they make that up in the hold harmless clause. The hold harmless money or equalization money goes to the general fund and that can go to . . . the general fund to be spent in classrooms. *Now, the board's question then is the money they lost in the state aid, do they want to raise the mill levy or cut the budget.* (Emphasis added.)

> "[Rep.] Ryckman:  And what money would they lose in state aid?

> "Mr. Dennis:  The money they would lose in LOB state aid would be . . . made up in hold harmless, but the board would have some option. The hold harmless money goes to the general fund and the LOB state aid loss is felt in the LOB fund. Now, there's a way you can do this. *The school district could choose to take the hold harmless money and indirectly put it in the LOB and not raise the mill levy, but you're more likely to see a little increase in mill levy because the LOB state aid is going down as such.* They got the same amount of money, but local boards will decide that and, Representative Hutton, they'll be all over the place. *Some will choose to raise the mill levy . . . .* Local decision there." (Emphasis added.)

27

In short, wealthier aid-qualifying districts that imposed additional mill levies to fill this gap will require less tax effort than poorer aid-qualifying districts, and those districts choosing to increase local levies will receive no additional corresponding supplemental general state aid for their effort—a combination that exacerbates existing inequities, if not creating additional ones. *Cf. Gannon I,* 298 Kan. at 1188 (raising LOB cap two percentage points without corresponding increase in supplemental general state aid exacerbated wealth-based disparities among districts because any additional funds would have to come entirely from each district's property tax base) (citing *Montoy III*, 279 Kan. at 834). These inequities may affect many of the 232 aid-qualifying districts—out of 286 total districts in the state—that lost some LOB aid under H.B. 2655.

So while the hold harmless provision creates the same distribution of funding seen under CLASS, we conclude its application actually allows increases in the inequity from the previous 2016-17 CLASS LOB funding distribution.

The State next points to the political necessity of the hold harmless provision and its benefit in ensuring district budget certainty in the 2016-17 school year as reasons we should accept H.B. 2655. Neither of these purposes have a bearing on Article 6 equity compliance in this context. See generally *Gannon I*, 298 Kan. at 1135-37.

Budget certainty for schools is an admirable goal. But CLASS itself was in part constructed with the objective of multi-year budget certainty for districts, and we still found the magnitude of the inequities in its provisions ran afoul of Article 6. See *Gannon II*, 303 Kan. at 732-33. An unconstitutional school funding system is not rendered constitutional merely because a district treated inequitably can budget with some certitude for its inequitable treatment.

28

The political necessities of the legislature are similarly irrelevant to our review. The constitution of the people of Kansas does not change its requirements based on legislators' support, or nonsupport, of proposed legislation. See 303 Kan. at 735 (citing *Atkinson v. Woodmansee*, 68 Kan. 71, 75, 74 P. 640 [1903]). Rather, the Kansas Constitution "is the supreme and paramount law, receiving its force from the express will of the people." 303 Kan. at 735 (quoting *Moore v. Shanahan,* 207 Kan. 645, 651, 486 P.2d 506 [1971]). Just as the legislature has the power and duty to create a school funding system that complies with Article 6, it is this court's power and duty to determine whether an act of the legislature is invalid under that constitution, *i.e.*, if the legislature has met its duty. See *Gannon II*, 303 Kan. at 734-35. A law's political expediency or level of support will not shield it from such review.

After considering all of the arguments, we conclude the State has failed to meet its burden on this issue in the remedial phase of this case. *Gannon II*, 303 Kan. at 709. Specifically, the hold harmless provision fails to sufficiently mitigate the increased inequities created by applying the capital outlay aid formula to the LOB funding system. At best, H.B. 2655 does no more than take away funds from the districts, then give the funds back, simply to restore the same level of inequity we ruled unconstitutional in *Gannon II*, 303 Kan. at 720. Additionally, it worsens disparity in accessing LOB funds among aid-qualifying districts.

*The Extraordinary Need Fund*

In 2015 the legislature passed CLASS, which created a fund for "extraordinary need state aid" and placed it under the control of the State Finance Council. K.S.A. 2015 Supp. 72-6476. The fund's purpose was to allow those districts experiencing extraordinary increases in enrollment, extraordinary decreases in their assessed valuation, and "any other unforeseen acts or circumstances which substantially impact the . . . general fund budget for the current school year" to apply to the Council for increased aid.

29

K.S.A. 2015 Supp. 72-6476(b). The aid was apparently created, in part, to attempt to cure inequities created when CLASS' block grants essentially froze all districts' funding at 2014-15 levels for 2015-16 and 2016-17, regardless of increased enrollments or drops in AVPP. See *Gannon II*, 303 Kan. at 694.

The three-judge panel described the positioning of the fund with the Council as "oddly placed." It continued: "The Kansas State Board of Education, at least in the first instance, has the constitutional duty of the oversight of USDs" and complained that "the needs evaluation procedure includes no part for that Board."

H.B. 2655 responds to this concern by moving the fund under the supervision of the State Board. In addition to the prior grounds for fund disbursement, the new law also allows the State Board to consider "whether the applicant school district has reasonably equal access to substantially similar educational opportunity through similar tax effort." L. 2016, ch. 45, sec. 9(b)(4). The State argues this provision also mitigates any shortcomings in the application of the capital outlay aid formula to the LOB funding mechanism. Specifically, it points out the State Board can reduce any continuing disparity by distributing extraordinary need funds to aid-qualifying districts.

We begin by observing that H.B. 2655 reduces the extraordinary need fund balance from $17.5 to $15.1 million. L. 2016, ch. 45, sec. 1(d). And while maintaining its original purpose, *i.e.*, providing relief for districts experiencing extraordinary increases in enrollment, extraordinary reductions in AVPP, and any other unexpected circumstances increasing the cost of performing their basic functions (L. 2016, ch. 45, sec. 9), the new law also expands the grounds for the fund's use by making it a backup for both the capital outlay and LOB aid provisions. L. 2016, ch. 45, sec. 1(e). The State argues that although the reduced fund balance is now also subject to even more bases for demands, it can sufficiently reduce the disparities in LOB funding we recognized in *Gannon II*.

30

As noted earlier, through operation of the hold harmless provision, H.B. 2655 provides districts with the same distribution of funding for 2016-17 as they received under CLASS for 2015-16; few exceptions are found in the data provided by the State. Because in *Gannon II* we held this distribution to be unconstitutionally inequitable, almost all aid-qualifying districts would have a valid demand on the extraordinary need fund for more monies under the law's new language. L. 2016, ch. 45, sec. 9(b) ("[T]he state board shall consider . . . whether the applicant school district has reasonably equal access to substantially similar education opportunity through similar tax effort."). See *Gannon I*, 298 Kan. at 1175.

We are simply not convinced by the State that these inequities can be cured even when exhausting the extraordinary need fund, particularly when monetary demands can already be made against it based upon districts' extraordinary increases in enrollment and decreases in AVPP. *Gannon II*, 303 Kan. at 709. We acknowledge that the State has provided this court with 700 pages of documents, in response to our suggestion in *Gannon II*, 303 Kan. at 743 ("[T]he State would help its case by showing its work in how it determined that any . . . proposed solution complies with *Gannon I*."). But this advice includes more than just providing documents. It requires the State to show justification for legislative decisions, *i.e.*, demonstrating to this court why the result of H.B. 2655 is equitable. See, *e.g.*, *U.S.D. No. 229 v. State*, Case No. 92 CV 1099 (Shawnee County District Court December 16, 1993) (unpublished opinion) (based on historical data presented by parties as justification for legislative action, as well as information from other states and statistical analysis commonly applicable to school finance issues, court concluded the LOB [including supplemental state aid] did not violate equal protection).

We hold the extraordinary need fund is an insufficient remedy for the residual inequities in the LOB funding mechanism. See *Gannon II*, 303 Kan. at 696 (extraordinary need fund found insufficient by panel to cure CLASS inequities).

31

*Summary*

In its present form, the SDFQPA capital outlay formula satisfies the equity provisions of Article 6 when applied to capital outlay and when fully funded. See *Gannon II*, 303 Kan. at 743. But the application of the SDFQPA capital outlay state aid formula to LOB supplemental general state aid not only fails to cure, but also worsens the inequities affirmed to exist in *Gannon II*. In short, disparities among the districts remain inequitable and unconstitutional.

Applying this same formula to two distinct programs reveals substantial differences. The LOB funding is much larger and provides a substantial amount of resources covering basic educational expenses akin to the purposes of BSAPP. The magnitude of disparity that can be tolerated in that system is therefore lower than what can be accepted in the more indirect and more restrictive capital outlay system. For as Mr. Tallman described to the legislature on March 21, 2016, "[W]hat we really have is every district has to levy 20 mills [required under K.S.A. 72-6431], and, then, every district has to levy some *other* mill rate *to fund that 25 to 30 percent of their budget*." (Emphasis added.)

While the hold harmless provision does somewhat mitigate the decrease in supplemental general state aid, it does so in a way that at best only brings districts to the same distribution held inequitable under *Gannon II*—while actually increasing disparity between the aid-qualifying districts. As described, the eventual decrease in supplemental general state aid allows aid-qualifying districts the option of accepting the hold harmless money and then backfilling the gap in their LOB, an easier task for wealthier districts because less mill levy increase is required than for poorer districts. Moreover, those districts will not be entitled to additional state aid for their new taxing effort because such equalization aid essentially was already included in the hold harmless monies. So the net

32

effect of the hold harmless provision is to worsen the LOB disparity in CLASS that we held unconstitutional in *Gannon II*.

The State has not shown that the hold harmless provision and the diluted extraordinary need provision will cure the increased disparities going forward. The State has the burden of proof in this remedial phase and, after review of H.B. 2655 and the legislative record, we hold it has not carried its burden. *Gannon II*, 303 Kan. at 709.

We take no issue with the stated goals of budget certainty and recognize the political realities of the legislative branch. But we must review lawmakers' efforts for conformity with the Kansas Constitution, which demands that school districts have reasonably equal access to substantially similar educational opportunity through similar tax effort. *Gannon I*, 298 Kan. at 1175. We conclude the LOB funding mechanism under H.B. 2655 is an "unsuccessful attempt[] to equitably, *i.e.*, fairly, allocate resources among the school districts." *Gannon II*, 303 Kan. at 744.

Issue 2: *Plaintiffs are not entitled to attorney fees.*

Plaintiffs have requested attorney fees at every stage of this case. The panel denied their initial request, and we affirmed that decision in *Gannon I*. 298 Kan. at 1195-96. In *Gannon II*, the plaintiffs renewed their request on appeal. We denied the request in part because it was not raised with the panel on remand, and, insofar as the request was for appellate attorney fees, it was procedurally insufficient because no motion was filed under Supreme Court Rule 7.07(b) (2015 Kan. Ct. R. Annot. 72). *Gannon II*, 303 Kan. at 733.

Nothing has changed since our February 11 opinion in this matter. The plaintiffs note they have a request for attorney fees pending in the panel which they filed shortly after the panel's decision we reviewed in *Gannon II*. Because the renewed motion for

33

attorney fees for the litigation phase of this case has not been ruled on, it is not before us on appeal. See K.S.A. 60-2101; see also *Snodgrass v. State Farm Mut. Auto. Ins. Co.*, 246 Kan. 371, 377-78, 789 P.2d 211 (1990) (decisions on attorney fees are not part of the merits and may be adjudicated separately). Additionally, the plaintiffs have not filed a motion for appellate attorney fees in this court. For the above reasons, we deny the plaintiffs' request for attorney fees on present showing.

*Constitutionality and Severability*

We have declared the supplemental general state aid provision of H.B. 2655 to be unconstitutional. The hold harmless and extraordinary need provisions do not cure the infirmities. Invalidating a provision because it is unconstitutional is not "rewriting" the statute. Rather, it is merely enforcing the constitution. See *National Federation of Independent Business v. Sebelius*, 567 U.S. __, 132 S. Ct. 2566, 2607, 183 L. Ed. 2d 450 (2012). See also *Central Branch Union Pac. R. Co. v. Atchison, T. & S.F.R. Co.*, 28 Kan. 453, 460-61 (1882) (court is exercising its constitutional duty when it ascertains that one part of legislation conflicts with the constitution and must fail).

The question then becomes:  What effect does our holding have on the remaining provisions of H.B. 2655 and CLASS? See *Sedlak v. Dick,* 256 Kan. 779, 803, 887 P.2d 1119 (1995) ("Since we have held the above provisions of K.S.A. 44-555b to be unconstitutional, we must determine what effect our holding has on the remaining provisions of the statute and the Act.").

The State urges us to sever any unconstitutional provision and let the remainder of CLASS stand. It points out that while CLASS contained a nonseverability clause—K.S.A. 2015 Supp. 72-6481(a) —section 12 of H.B. 2655 specifically repeals that clause. And section 2(c)(3) of this new law replaces it with a severability clause:  "[T]he provisions of this act should be considered as severable."

34

The plaintiffs respond that the LOB funding mechanism, including the hold harmless and extraordinary need provisions, is not severable from CLASS, so the entire Act is unconstitutional. They also ask us to lift our stay of the panel's extensive remedial orders, which included, in part, reinstating certain provisions of the SDFQPA and mandating some additional funding. See *Gannon II*, 303 Kan. at 697-98.

To begin our severance analysis, we acknowledge the caution provided from several justices of the United States Supreme Court:

"An automatic or too cursory severance of statutory provisions risks 'rewrit[ing] a statute and giv[ing] it an effect altogether different from that sought by the measure viewed as a whole.' *Railroad Retirement Bd. v. Alton R. Co.,* 295 U.S. 330, 362, 55 S. Ct. 758, 79 L. Ed. 1468 (1935). The Judiciary, if it orders uncritical severance, then assumes the legislative function; for it imposes on the Nation, by the Court's decree, its own new statutory regime, consisting of policies, risks, and duties that Congress did not enact. *That can be a more extreme exercise of the judicial power than striking the whole statute and allowing Congress to address the conditions that pertained when the statute was considered at the outset*." (Emphasis added.) *National Federation of Independent Business v. Sebelius,* 132 S. Ct. at 2668 (Scalia, J., dissenting).

To avoid an automatic or too cursory severance, we apply our nearly 60-year-old two-part Kansas test that was recently confirmed as follows:

"'Whether the court may sever an unconstitutional provision from a statute and leave the remainder in force and effect depends on the intent of the legislature. If from examination of a statute it can be said that [1] the act would have been passed without the objectionable portion *and* [2] if the statute would operate effectively to carry out the intention of the legislature with such portion stricken, the remainder of the valid law will stand. Whether the legislature had provided for a severability clause is of no importance. This court will assume severability if the unconstitutional part can be severed without

35

doing violence to legislative intent.'" (Emphasis added.) *Brennan v. Kansas Insurance Guaranty Ass'n*, 293 Kan. 446, 463, 264 P.3d 102 (2011) (quoting *Felten Truck Line v. State Board of Tax Appeals,* 183 Kan. 287, 300, 327 P.2d 836 ([1958]).

Our test has some resemblance to the two-part approach utilized by the United States Supreme Court—both parts of which also must be satisfied in order to sever. "The standard for determining the severability of an unconstitutional provision is well established: "'[1] Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped [2] if what is left is fully operative as a law."'" *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684, 107 S. Ct. 1476, 94 L. Ed. 2d 661 (1987). But the statutory remainder also must "function in a *manner* consistent with the intent of Congress." 480 U.S. at 685. See *Sebelius,* 132 S. Ct. at 2608, 2676 (The remainder will "still function in a way 'consistent with Congress' basic objectives in enacting the statute.'").

*The severability clause*

*Brennan* quoted *Felten* to state that "'[w]hether the legislature had provided for a severability clause *is of no importance*.'" (Emphasis added.) 293 Kan. at 463. But this statement requires some explanation, given the earlier *Brennan-Felten* quotation: "'Whether the court may sever an unconstitutional provision from a statute and leave the remainder in force and effect *depends on the intent of the legislature*.'" (Emphasis added.) 293 Kan. at 463. As explained below, the statement regarding the severability clause should more accurately provide: "*At the later stage of the analysis*, whether the legislature had provided for a severability clause is of no importance."

Certainly, the presence of a severability clause is direct evidence of legislative intent—which *Brennan* indicates is our touchstone. *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 913, 179 P.3d 366 (2008). As the State admitted at oral argument,

36

however, the clause's presence is not dispositive of the severability issue; it simply creates a presumption of severability. See *State v. Next Door Cinema Corp.*, 225 Kan. 112, 118-119, 587 P.2d 326 (1978) (The effect of a severability clause "is to create . . . presumption of separability."). See *Alaska Airlines, Inc.*, 480 U.S. at 686 ("[S]uch a clause creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision."). In other words, for determining legislative intent, the severability clause "is an aid merely; not an inexorable command." *Dorchy v. State of Kansas,* 264 U.S. 286, 290, 44 S. Ct. 323, 68 L. Ed. 686 (1924).

Accordingly, despite the presence of a severability clause, at least as early as 1947 this court has declared an entire act void—*i.e.*, been unable to sever the unconstitutional provision from its companions. *State ex rel. v. Hines*, 163 Kan. 300, 322, 182 P.2d 865 (1947); see *Sedlak v. Dick*, 256 Kan. at 803-04; *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1023, 850 P.2d 773 (1993); *Boyer v. Ferguson*, 192 Kan. 607, 389 P.2d 775 (1964). The United States Supreme Court has made similar holdings. See, *e.g.*, *Sloan v. Lemon*, 413 U.S. 825, 834, 93 S. Ct. 2982, 37 L. Ed. 2d 939 (1973); *Williams v. Standard Oil Co. of Louisiana*, 278 U.S. 235, 245, 49 S. Ct. 115, 73 L. Ed. 287 (1929), *overruled in part on other grounds by Olsen v. Nebraska*, 313 U.S. 236, 61 S. Ct. 862, 85 L. Ed. 1305 (1941); *Hill v. Wallace*, 259 U.S. 44, 70, 42 S. Ct. 453, 66 L. Ed. 822 (1922).

With this background, we continue our severability analysis. We observe that the supplemental general state aid provisions were designed by the legislature to specifically address inequities it acknowledged existed in the system—in particular, those created by the LOB funding device. See *Gannon I*, 298 Kan. at 1185 (legislative creation and distribution of supplemental general state aid "would be meaningless if inequalities were not inherent within the LOB funding scheme").

The severance of the unconstitutional provisions designed to cure these inequities obviously leaves those inequities still in place. See *Gannon I*, 298 Kan. at 1185 ("And as with the withholding of capital outlay equalization payments, once the general supplemental state aid was reduced, it logically follows that the inequity that equalization aid was designed to cure remains present. The State points to nothing in the record demonstrating that the inequity was eliminated or lessened on its own or by other means."); see also *Gannon II*, 303 Kan. at 717 (quoting *Gannon I*, 289 Kan. at 1179) ("'Once payments have stopped, it logically follows that the inequity the equalization aid was originally designed to cure remains present.'").

It just as logically follows that if the statutory attempts to cure, *e.g*., the hold harmless and extraordinary need fund, are insufficient to eliminate the unconstitutionality, then the deletion of these and all other cures necessarily maintains the state of unconstitutionality. And so we hold. Accordingly, we cannot accept the State's request that we simply sever the unconstitutional LOB aid (supplemental general state aid) provision and leave the remainder of H.B. 2655 intact.

Simply put, severance actually worsens the inequitable situation. To put this exacerbation in financial perspective, a KSDE spreadsheet shows that severance of this aid provision would mean a loss of approximately $367 million for the 2016-17 school year to those 197 school districts which are scheduled to receive such aid. According to Deputy Education Commissioner Dennis, all of the State's educational funds for districts in school year 2016-17 total " a little over $4 [billion]." So taken as a whole, the loss represents a 9% funding reduction to aid-qualifying districts.

This holding brings us to the State's alternative argument: sever additional provisions as necessary and save the remainder of CLASS. The next logical step for severance after the supplemental general state aid provision is the inequity-producing

LOB provision itself. After all, why not sever the provision that has created the inequity and consequently created the need for the supplemental general state aid?

The principal problem with this severance alternative requested by the State is that according to KSDE spreadsheets, the LOB "local effort" funding mechanism generates approximately $693 million per year for those school districts with LOB's. Combining this loss with the supplemental general state aid loss of $367 million per year means slightly more than $1 billion per year—roughly 25% of all the educational funds for districts from the State—would be gone.

At oral arguments the State acknowledged the magnitude of this funding loss. But its counsel nevertheless contended that loss of $1 billion through severance is better than the loss of the $4 billion that would result if severance were not allowed and the entire funding act (CLASS) were held unconstitutional. He argued that this severance at least would allow the school districts to operate from July 1 until some unknown point during school year 2016-17 when the remaining $3 billion was exhausted. By then, he reasoned, the legislature would supply a constitutional financial fix allowing schools to continue unimpeded operation through the balance of the school year.

We again acknowledge that "[a]n automatic or too cursory severance of statutory provisions risks 'rewrit[ing] a statute and giv[ing] it an effect altogether different from that sought by the measure viewed as a whole.'" *National Federation of Independent Business v. Sebelius,* 132 S. Ct. at 2669 (Scalia, J., dissenting). So analysis of this part of the State's severance argument requires careful application of our test for severance.

As we specifically apply the two factors expressed in *Brennan*, we first ask whether the legislature would have passed CLASS without the unconstitutional LOB and supplemental general state aid provisions—which supply approximately $1 billion or

39

25% of all state funds for K-12 public school education. We are not persuaded for several reasons.

First, as of the 2016 legislative session, the State already had been in continuous litigation since 2010 over its alleged violation of the adequacy provisions of Article 6 of the Kansas Constitution. See *Gannon I*, 298 Kan. at 1115 (*Gannon* suit filed November 2010).

Second, on June 26, 2015, the three-judge panel ruled the State's then-current funding was constitutionally inadequate and ordered remedies—including the State's payment of amounts that, when calculated, would be millions of dollars. As of the 2016 legislative session this panel holding had not been ruled upon by this court—per our order of June 30, 2015, which stayed the panel's order pending our decision on equity. *Gannon II*, 303 Kan. at 698.

Third, in *Gannon II* we cautioned the legislature that any funding system it enacted in response to our decision "must be demonstrated to be capable of meeting the equity requirements of Article 6—while not running afoul of the adequacy requirement." *Gannon II*, 303 Kan. at 743.

Fourth, the legislature's inclusion of the hold harmless provision demonstrates that many of its members apparently were concerned about *any* amount of reduced funding to school districts caused by H.B. 2655. Indeed, nine of the senators voting "yes" indicated that the hold harmless concept represented a significant part of their decision-making process. According to Senator Denning:

> "Madam President: I vote yes on Sen Sub for H.B. 2655 because of the evidence presented. . . . Moreover, it *includes a 'hold harmless' provision that means no school district loses funds*. All the school districts that testified . . . acknowledged that *the hold harmless provision is necessary*

40

in light of the legislature's obligation to respond to the Court's remedial order while the school districts' budgeting processes are occurring. The Department of Education witnesses confirmed this view, too." (Emphasis added.)

Denning's "Explanation of Vote" was concurred with by Senate President Wagle, and Senators Arpke, Fitzgerald, Lynn, Masterson, Melcher, Smith, and Wolf.

And as a former Speaker of the House explained to legislators, the hold harmless provision also guards against a claim of constitutionally inadequate funding:

"*No district losing funds, that's the hold harmless provision. . . . No one is going to lose under this.* The Court did have one phrase in its opinion that suggested that you ought to, even though this in the equity phase, you should not lose sight of adequacy. *And——with hold harmless, you guard against a claim* that, well, you have taken money from me that I was expecting that I already had in my budget and so I'm no longer adequate. *Hold harmless provisions take care of that*." (Emphasis added.)

Finally, we take judicial notice of the recent budget bill the legislature submitted to the governor in May 2016. While authorizing allotments (reductions) to state government funds appropriated by the legislature, the bill essentially exempted K-12 school funding reduction from allotment authority for FY 2017. 2016 House Substitute for Senate Bill No. 249, section 45 provides:

"The provisions of section 98(a)(2) of 2016 House Substitute for Senate Bill No. 161 [allowing reduction through allotments] shall not apply to any item of appropriation which provides funding to any state agency *for school districts educating students in kindergarten or any of the grades one through 12*." (Emphasis added.)

We therefore deem it quite unlikely the legislature would have passed legislation intentionally cutting the K-12 public school education budget—which the panel found was already underfunded, *i.e*., inadequate—by another $1 billion, or 25%. See *State ex*

41

*rel. v. Wyandotte County Comm'rs*, 140 Kan. 744, 754, 39 P.2d 286 (1934) (court "convinced that the legislature would not have given its sanction to this enactment" without the unconstitutional provision so statute as a whole cannot stand); see also *Champlin Refining Co. v. Corporation Com'n of State of Okl.*, 286 U.S. 210, 234, 52 S. Ct. 559, 76 L. Ed. 1062 (1932) (after application of severability clause, remaining provisions stand "[u]nless it is evident" legislature would not have enacted just those provisions).

Nonseverability here is appropriate not only because of a failure of the first part of *Brennan*'s test but also because of an even more evident failure of the second. That part provides: "'[I]f the statute would operate effectively to carry out the intention of the legislature with such portion stricken, the remainder of the valid law will stand. . . . This court will assume severability if the unconstitutional part can be severed without doing violence to legislative intent.'" 293 Kan. at 463. See *Sebelius*, 132 S. Ct. at 2608 (the remainder will "still function in a way 'consistent with Congress' basic objectives in enacting the statute.'"); *Alaska Airlines*, 480 U.S. at 685 (the remainder also must "function in a *manner* consistent with the intent of Congress").

We begin this analysis of the second part of the *Brennan* test by examining the express "'intention of the legislature'" in passing H.B. 2655. 293 Kan. at 463. According to its preamble, "[t]he legislature is committed to avoiding any disruption to public education and desires to meet its obligation." And section 2(b) provides: "*The legislature has been advised that funding disruptions and uncertainty are counter-productive to public education* and that the funding certainty of the classroom learning assuring student success act [CLASS] is critical to the effective operation of school districts . . . ." (Emphasis added.) H.B. 2655, sec. 2(b).

Similarly, section 6(b) states: "*The legislature hereby declares that the intent of this act is to . . .* provide more flexibility and increased local control for school district

42

boards of education and administrators in order to (1) *Enhance predictability and certainty in school district funding sources and amounts* . . . (3) maximize opportunities *for more funds to go to the classroom*." (Emphasis added.)

Finally, section 6(c) provides: "*The legislature further declares* that the guiding principles for the development of subsequent legislation for the finance of elementary and secondary public education should consist of . . . (1) *Ensuring that students' educational needs are funded*; (2) *providing more funding to classroom instruction*." (Emphasis added.)

These express legislative statements repeatedly make clear that with the LOB and supplemental general state aid provisions severed, CLASS cannot operate effectively to carry out the intention of the legislature. Among other things, severance and the immediate loss of $1 billion of school funding would seriously undermine the legislature's "desire[] to meet its obligation" under Article 6 of the constitution. And this loss of 25% of all educational funds until such time as the legislature might restore them contradicts the legislative intent to (1) "avoid[] any disruption to public education"; to (2) "enhance predictability and [provide] certainty" in planning school district budgets; and to (3) "maximize opportunities for more funds to go to the classroom."

The legislature's intent has been expressed not only in H.B. 2655's language and legislative history, but also in the State's brief. "When simply reverting to all of the old formulas failed to gain support, the [2016] Legislature considered other approaches, *all with the predominant goal in mind of creating a constitutionally equitable system of school finance*." (Emphasis added.)

These points lead us to conclude that severance of these two provisions would do "'violence to legislative intent.'" *Brennan*, 293 Kan. at 463. The school district reorganization case of *Hines*, 163 Kan. 300, is of particular guidance. There, the plaintiff

43

claimed the legislature had unconstitutionally delegated its legislative power to local committees which would reorganize school districts throughout the state. The court began its analysis with several important observations similar to ours in the instant case.

> "Before giving consideration to the specific questions presented, some general observations should be made. The court is cognizant of the complicated consequences which rest upon the result of the litigation. *The court realizes that probably nothing is more essential to the welfare of the state than the continued maintenance of adequate schools . . . . The court . . .* [understands] *the complex problems which have confronted the legislature in its efforts to enact satisfactory legislation controlling the controversial questions which arise upon consideration of school reorganizations*. As a consequence this case presents an instance wherein the rule relative to the duty of a court to hold that statutes are valid, whenever it is reasonably possible to do so, has profound significance." (Emphasis added.) 163 Kan. at 301.

With these observations in mind, the court nevertheless found several statutory provisions unconstitutional. And despite the presence of a severability clause, the court held that these unconstitutional provisions could not be severed, and it declared all provisions void. 163 Kan. at 321-22. In support the *Hines* court cited *State v. Smiley,* 65 Kan. 240, 247, 69 P. 199 (1902):

> "[I]f the void and valid parts of the statute are so connected with each other *in the general scheme of the* act that they cannot be separated *without violence to the evident intent of the legislature*, the whole must fail. These rules are of everyday enforcement in the courts." (Emphasis added.)

As *Smiley* expressed, severance is rejected when the provisions are connected in the general scheme of the act, *i.e.*, when severance would change its scope. See *State ex rel., v. Consumers Warehouse Market*, 185 Kan. 363, 372, 343 P.2d 234 (1959) ("The invalid portion of the statute is not a separate and independent provision of the Act, but

44

rather is such an integral and inseparable part of the whole scheme and purpose of the law that it may not be severed therefrom and thus leave the remainder in full force and effect. In other words, to eliminate the objectionable exemption would change the scope of the Act.").

As the concept of nonseverability of unconstitutional provisions has been considered by Kansas courts for more than 100 years, obviously its cousin—the threshold concept of statutory invalidity—has been as well. See *Gannon II*, 303 Kan. at 743-44. There we observed that an unconstitutional act is invalid because """it is not a law . . . it is, in legal contemplation, as inoperative as though it had never been passed.""" 303 Kan. at 744 (quoting *Wyandotte Co. v. K.C., F.S. & M. Rld. Co.*, 5 Kan. App. 43, 44, 47 P. 326 [1896]). And as we cautioned there, without a constitutionally equitable school finance system, the schools in Kansas will be unable to operate.

As we explained in more detail in *Gannon II*, the inability of Kansas schools to operate would not be because this court would have ordered them closed. Rather, it would be because this court would have performed its sworn duty to the people of Kansas under their constitution to review the legislature's enactments and to ensure the legislature's compliance with its own duty under Article 6. See *Gannon II*, 303 Kan. 682, Syl. ¶ 9. Simply put, the state legislature's unconstitutional enactment is void; it has not performed its duty. *Gannon II,* 303 Kan. at 743-44; see *Auditor of State v. A.T. & S.F. Railroad Co.,* 6 Kan. 500, 506, 1870 WL 507(1870) (quoting *Marbury v. Madison*, 5 U.S. [1 Cranch] 137 [1803]) ("'It is emphatically the province and duty of the judicial department to say what the law is.'").

We acknowledge the legislature's intent, as recently expressed in its preamble to H.B. 2655: "The legislature is committed to avoiding any disruption to public education and desires to meet its obligation." So, we continue to stay the issuance of our mandate— and the stay of the panel's broad remedial orders—until June 30, 2016. This will give the

legislature yet another opportunity to treat Kansas students fairly and "to craft a constitutionally suitable solution and minimize the threat of disruptions in funding for education." 303 Kan. at 741.

BEIER and STEGALL, JJ., not participating.

MICHAEL J. MALONE, Senior Judge, and DAVID L. STUTZMAN, District Judge, assigned.[1]

* * *

JOHNSON, J., concurring in part, dissenting in part: I agree with the majority's determination that the legislature's latest changes to the local option budget supplemental general state aid program (hereafter referred to as LOB) did not cure the inequities which this court confirmed were unconstitutional in March of 2014 and reaffirmed as unconstitutional in February 2016.

But I continue to believe that this court should join with the district court panel to affirmatively remedy the unconstitutionality, rather than continuing to merely offer the functional equivalent of declaratory judgments. See *Gannon v. State*, 303 Kan. 682, 746, 368 P.3d 1024 (2016) (Johnson, J., concurring in part, dissenting in part) (opining that this court should lift the stay on the district court's remedial orders). If this court had not issued a stay on the district court's remedial orders on June 30, 2015, the public educational system in Kansas would have avoided yet another year of unconstitutional inequity. In my view, maintaining the integrity of our state constitution and providing

---

[1] **REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 113,267 vice Justice Stegall under the authority of the Supreme Court by K.S.A. 20-2616, and District Judge Stutzman was appointed to hear the same case vice Justice Beier under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.

equitable educational opportunities for our children are too important for this court to be constrained by any concern that the legislature will be offended that we told it how to do its job. After all, this court has its own job to do, as well.

Specifically, I would lift the stay on those district court remedial orders that require the legislature to fully fund the LOB as it existed before the institution of this lawsuit. Although the majority leaves open the possibility of lifting the stay on the district court's remedial orders on July 1, 2016, I would do it now. The legislature has had more than enough opportunities to resolve this unconstitutionality on its own terms.

I acknowledge the State's complaint that such an order would violate the separation of powers by encroaching upon the legislative branch's constitutional authority to appropriate money, pursuant to Article 2 of the Kansas Constitution. But the legislature has repeatedly failed or refused to exercise its Article 2 constitutional authority to fulfill its Article 6 constitutional *responsibility* with respect to the educational interests of this state. By allowing the legislature to close the schools and shut off all monies to all the public schools through the simple tack of taking no action to fix the unconstitutional inequities, this court would be enabling the legislature's dereliction of constitutional duty. Moreover, I fear that some might view the closure of all public schools as a victory.

As a practical matter, a remedial order to fully fund the original LOB program, *i.e.*, requiring the legislature to use the "safe harbor" this court proffered 2 years ago, would be far less draconian than the State's suggestion that we sever the entire LOB program, thereby denying the schools approximately $1 billion, or about 25% of the total educational budget. And, after all, as the State's attorney repeatedly asserted at oral arguments: "It's only for 1 year."

47